**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SAVIS, INC., | ) | |
| | ) | Case No. 18 CV 6521 |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | |
| NEFTALI CARDENAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Plaintiff Savis, Inc. ("Savis") brought this diversity action primarily to enforce noncompetition and nondisclosure clauses in employment contracts signed by its former employee, defendant Neftali Cardenas ("Cardenas"), who left employment with Savis in September 2018 to take a position with Pfizer, Inc. ("Pfizer"), a Savis client. In addition to two breach of contract claims pleaded in Counts I and II of the complaint, Savis brings claims for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and tortious interference with contracts, business relationships, and business expectations in Counts III–IV respectively. Compl. 13–22, ECF No. 1. Savis has filed a motion for a temporary restraining order ("TRO"), seeking to prohibit Cardenas from working for Pfizer and from disclosing alleged confidential information. Cardenas, who had never set foot in Chicago before the first hearing on Savis' motion for a TRO, Cardenas Decl. ¶ 16, ECF No. 31, moves to dismiss for lack of personal jurisdiction.

# I. Background

## A. Procedural History

Savis filed its complaint on September 25, 2018, and a placeholder motion for a TRO two days later on September 27, ECF No. 8. The one-page motion was intended to permit the clerk to place the motion on the judge's calendar for the next day on an emergency basis. *See id.* at 1; Notice Mot. 1, ECF No. 9. Savis filed a more fulsome motion for a TRO later on September 27, which is presently before the court, ECF No. 10.

No one appeared for Cardenas on September 28, 2018, and the court ordered Savis to give Cardenas notice of the TRO before proceeding. *See* Fed. R. Civ. P. 65(b); ECF No. 14. The hearing was set for October 3, *id.*, but on October 1, Savis renoticed its motion for presentment on October 10, ECF No. 17. Mr. Cardenas nevertheless appeared in open court on October 3, and a hearing was held. Minute Entry, ECF No. 25. Savis' counsel summarized the motion for a TRO; Cardenas moved to recruit counsel; and the court granted his motion, finding "that defendant is effectively indigent for purposes of proceedings on plaintiff's motion for a temporary restraining order and for preliminary injunction."[1] Minute Order 1, ECF No. 20. The court held a hearing on Savis' motion for a TRO on October 10, 2018. Minute Entry, ECF No. 33. Earlier that day, Cardenas filed several papers, a response in opposition to the motion for TRO, ECF No. 29; his pending motion to dismiss for lack of personal jurisdiction, ECF No. 30; and a declaration in support of both filings, ECF No. 31. Savis and Cardenas each called one witness at the hearing. Cardenas called himself. Savis called a Chicago-based project manager, Yasser Abdullah ("Abdullah").

---

[1] On October 22, 2018, Savis filed a motion seeking reconsideration of the court's order recruiting counsel. ECF No. 37. That motion has not been presented to the court, and the court expresses no opinion about it.

Savis relies primarily on the affidavits of Tim Mussman ("Mussman") to support its factual positions. Mussman filed three affidavits in support of its TRO motions, referred to here as his first, second, and third affidavits respectively.[2] ECF Nos. 11-1, 34-1, and 35-3. The Mussman affidavits supporting Savis' response to Cardenas' motion to dismiss and in support of its reply to its motion for a TRO overlap, but they are not identical. *Compare* ECF No. 34-1, *with* ECF No. 35-3. Similarly, Savis filed a largely, but not entirely, overlapping set of exhibits with its reply in support of its motion for a TRO and with its response to Cardenas' motion to dismiss. *Compare* ECF No. 34, *with* ECF No. 35. Notably, Mussman's third affidavit, filed in support of its reply to its motion for a TRO, includes several averments not present in his prior affidavits and incorporates several exhibits the court had not seen before the filing of the response and reply ("collectively new exhibits"). The motions' different procedural postures require the court to take a somewhat dualistic perspective on the new exhibits. Savis' new exhibits must be disregarded for purposes of the TRO motion because "[a] party . . . cannot make conclusory and underdeveloped arguments in its opening brief and then deign to support and develop those arguments in his or her reply brief." *Thompson v. AT&T Servs.*, 2018 WL 4567714, at *6 (N.D. Ill. Sept. 24, 2018) (quoting *Johnson v. Root*, 812 F. Supp. 2d 914, 924 (N.D. Ill. 2011)) (granting motion to strike new arguments and declarations submitted with reply brief). But for purposes of deciding Cardenas' motion to dismiss, Savis' new evidence comes in a response to which Cardenas has been given the opportunity to reply and must therefore be considered when deciding that motion. Some of the new exhibits are discussed in the following paragraph to provide context and as necessary to decide Cardenas' motion to dismiss, but the court does not consider the new exhibits when deciding Savis' motion for a TRO.

---

[2] The record contains a fourth affidavit from Mussman in support of Savis' motion to seal Exhibit F to the complaint. *See* ECF No. 4-1.

**B. The Parties**

Savis is incorporated in Florida.  1st Mussman Aff. ¶ 3.  Its "principal place of business" is located in Chicago, Illinois, though Mussman's first affidavit says somewhat confusingly that Savis' "headquarters" are in Florida.  *Id*.  Savis describes itself as "a project consulting firm with over 25 years of [Good Management Processes ("GMP")] expertise and has a U.S. based team specializing in engineering, validation, regulatory and IT solutions."  *Id.* ¶ 16.  Savis alleges in its complaint that Cardenas "resides" in California, ECF No. 1 ¶ 4, and Cardenas avers that he is a citizen of California, Cardenas Decl. ¶ 3.  Cardenas has a California driver's license, is registered to vote in California, and paid California income taxes on his earnings while he worked for Savis.  *Id.* ¶¶ 4–6, 11.

**C. Cardenas' Employment with Savis**

After graduating from college, Cardenas submitted his resume to Savis in July 2016 via a popular website for job seekers.  *See id.* ¶ 7.  He interviewed by phone from California with Savis' president and a human resources representative in Chicago.  *Id.* ¶ 8; 2d Mussman Aff. ¶ 11.  Savis sent him a written offer of employment as a project engineer after the interview, ECF No. 34-7 (Aug. 2, 2016).  Cardenas signed Savis' offer letter in California.  Cardenas Decl. ¶ 10. According to Savis, Cardenas initially worked on a project for Amgen, a client, located in Thousand Oaks, California.  *See* 2d Mussman Aff. ¶ 12.

Savis reassigned Cardenas to work in Kansas at a facility operated by Pfizer.  Cardenas Decl. ¶ 12; Compl. ¶ 20.  Savis paid Cardenas a per diem and covered the cost of his lodging, transportation, and meals.  Cardenas Decl. ¶ 12; Compl. ¶ 20.

Savis began working on the Kansas project for Pfizer in 2016, and its work is ongoing. 1st Mussman Aff. ¶ 17.  Cardenas received several raises while working for Savis.  Cardenas

Decl. ¶ 20.  Cardenas avers that he received his training from a Pfizer employee.  *Id.* ¶ 19.
Mussman partially disputes that claim.  *See* 2d Mussman Aff. ¶ 24.

On May 31, 2018, Savis sent Cardenas a letter offering to renew his employment with
Savis; the offer superseded all prior agreements he had with Savis.  ECF No. 1-1 at 1.  The letter
stated that the offer was for "initial placement of employment" in Chicago but listed "current
place of work" as Kansas.  *Id.* at 2.  The letter also stated that, as part of his duties, Cardenas will
"[o]we a duty of loyalty to the Company and will devote Employee's full working time,
attention, and efforts to the business and affairs of the Company" and that Cardenas "[w]ill not
directly or indirectly engage in any business activity competitive with the Company's business or
divert any business opportunity related to the Company's business from [sic] the Company."[3]
*Id.* at 1.  Cardenas signed this letter on June 5, 2018.  *See id.* at 3.

On or around June 6, 2018, Cardenas also signed an employment agreement dated April
1, 2018.  ECF No. 1-2; *see also* Cardenas Decl. ¶ 22.  It contained the following clauses:

### 3. <u>Non-Disclosure of Confidential Information</u>

> Employee understands and acknowledges that during Employee's
> employment with the Company, Employee will be given access to, and will
> be entrusted with, confidential or proprietary information concerning the
> business and affairs of the Company, the Company's respective clients and
> prospective clients, and other third parties who entrust information to the
> Employee with the understanding, express or implied, that it will be kept
> confidential (collectively, "Confidential Information").

> Employee acknowledges and agrees that: (1) the Company has expended
> significant resources in developing, compiling and maintaining the
> Confidential Information and/or have [sic] received such information from
> third parties under obligations of confidentiality; (2) the Confidential
> Information derives independent economic value, actual or potential, from
> not being generally known to the public or to other persons who can obtain
> economic value from its disclosure or use; (3) the Confidential Information
> is the subject of efforts that are reasonable under the circumstances to

---

[3] The letter also stated that "[a]ny dispute arising from this offer or employment will be disputed in the state of
Florida under Florida law." *Id.* at 3.  The parties do not discuss this provision.

maintain its secrecy; (4) the disclosure of any Confidential Information to competitors of the Company or to the general public would be highly detrimental to the legitimate business interests of the Company; and (5) Employee's obligations with respect to confidential or proprietary information are in addition to any obligations Employee may have under Uniform Trade Secrets Act or other applicable law governing the protection of trade secrets.

During Employee's employment with the Company, and for a period of **two (2) years** after termination of services (whether voluntary or involuntary), Employee shall not, directly or indirectly, use or disclose any Confidential Information, except (1) as may be required for Employee to perform properly Employee's assigned employment duties and responsibilities for the benefit of the Company or (2) as may be required by applicable law. During Employee's employment with the Company, and for a period of **two (2) years** after termination of services (whether voluntary or involuntary), Employee will protect such information and treat it as strictly confidential. Employee acknowledges and agrees that Employee's access to and permission to use the Company's computer systems, networks and equipment is restricted to legitimate business purposes on behalf of the Company. Any other access to or use of such systems, network or equipment is without authorization and is prohibited.

. . . .

## 8. <u>Non-Compete</u>

Employee recognizes the Company's legitimate interest in protecting, for a reasonable period of time after employment, existing clients and prospective clients of the Company with which Employee becomes involved or as to which Employee acquires Confidential Information during employment with the Company. Employee agrees, during the time the Employee is providing services for the Company and for a period of **two (2) years** after the termination of services, whether termination is voluntary or involuntary, Employee shall not–without the Employer's prior written consent–directly or indirectly, make, offer, sell or furnish any products or services similar to, or otherwise competitive with, those offered by the Company to any client of the Company, or any prospective client of the Company with which Employee was involved or which Employee acquired Confidential Information.

. . . .

## 10. <u>General and Miscellaneous Provisions</u>

. . . .

     c. **Choice of Law**: This agreement will be governed, construed and enforced in accordance with the laws of the State of Florida.

     d. **Choice of Forum and Jurisdiction**: The Company and the Employee hereby agree that any action to enforce any provision of this Agreement shall be brought either in the State of Florida or the State of Illinois. The parties agree and submit to exclusive venue and personal jurisdiction in any federal or state court located in the State of Florida OR ILLINOIS for any action seeking injunctive relief or other equitable relief or any suit to enforce this agreement.

ECF No. 1-2 at 2, 5, 6–7 (emphasis in original).

Savis learned that Cardenas accepted a position with Pfizer on September 7, 2018, and sent him a letter, ECF No. 1-3, demanding that he cease and desist. Compl. ¶ 26. Cardenas responded by letter dated September 14, 2018, from a Kansas attorney representing him, resigning his position with Savis. Compl. ¶ 25; *see also* Letter, ECF No. 1-4. In his letter, Cardenas argued that he was not violating the noncompetition clause because he was performing substantially different work for Pfizer in a different group. *See* Letter 1.

At the evidentiary hearing held on October 10, 2018, Cardenas described his daily work for Savis at the Kansas site. Cardenas described his daily activities as evaluating machines used in the drug manufacturing process, such as a washer used to sterilize vials or an autoclave used to sterilize glassware, for compliance with federal regulations, and coordination with the client, if necessary, to bring equipment into compliance. *See* Tr. of Oct. 10, 2018, Hr'g at 56–61; *see also* 2d Mussman Aff. ¶ 23. Cardenas conducted a "statistical analysis" known as a "Failure Mode Evaluation Assessment" and then worked with the client and other Savis employees to take whatever steps are needed to bring the machine into compliance. *Id.* at 59; *see also* Cardenas Decl. ¶ 25. Cardenas avers that he did not have access to Savis' confidential information such as pricing methods and marketing and did not participate in meetings where those sorts of Savis information were discussed. Cardenas Decl. ¶¶ 23, 24.

Savis disputed Cardenas' description of his daily activities and access at the October 10, 2018, hearing. Its witness, Abdullah, did not supervise Cardenas on a daily basis, however, and Abdullah admitted that Mussman, who could not be present, would be able to testify in greater detail about Savis' view of the work Cardenas performed. *See* Tr. at 39–40. Mussman claims generally that "[a]s a Project Engineer, Cardenas was provided access to and utilized Savis' business-related documents and information." 1st Mussman Aff. ¶ 10. This occurred in part through daily, 8:00 a.m., conferences between the team working in Kansas and personnel in Savis' Chicago office. 2nd Mussman Aff. ¶¶ 17, 23–24. According to Mussman, "Cardenas maintained daily contact with Savis' main office in Chicago, Illinois concerning financial and operational issues and decisions" and was exposed to Savis' "business-related documents, information, and internal mechanisms" at those meetings. *Id.* ¶ 17. According to Mussman, Cardenas' responsibilities grew between 2016 and September 2018; Cardenas "managed" other updates and "he was the lead on making numerous process engineering changes." 2d Mussman Aff. ¶ 22.

Regarding Cardenas' new job with Pfizer, Cardenas testified that he will be working in Pfizer's Technical Services Department. Tr. at 61. As Cardenas understood his responsibilities (he was still in training on October 10), he will be using specialized computer software to track defects reported on handwritten forms completed by inspectors of the finished products manufactured at the Kansas facility, transferring those reports to computer software, and performing a statistical analysis of the resulting data to spot trends and make sure the defect rate does not exceed certain requirements. *See* Tr. at 61–63.

Abdullah testified that Cardenas "could be performing [the same task] for Savis, and [Savis] could be billing [Pfizer] for it." *Id.* at 48:6–7. The record does not make clear whether

Pfizer is presently willing to outsource the tasks Cardenas will be performing, though Savis performed a similar analysis of data spanning 2011–2017 for Pfizer. *See id.* at 47–48.

## II. Personal Jurisdiction

The court must decide whether it has personal jurisdiction over Cardenas before reaching Savis' motion for a TRO. That is because the court is powerless to issue an injunction binding Cardenas if it does not have personal jurisdiction over him. *Advanced Aerofoil Techs., Inc. v. Todaro*, 2011 WL 6009616, at *3 (N.D. Ill. Nov. 30, 2011) (citing *American Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 2d 876, 880 (E.D. Wis. 2005)); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'") (quoting *Emp'rs Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)).

### A. Legal Standard

When a defendant moves for dismissal under Rule 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction. *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008). If no evidentiary hearing is held and the motion is decided on written materials submitted by the parties, as is the case here, the plaintiff must make only a prima facie showing of personal jurisdiction. *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015) (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). When evaluating whether the plaintiff has carried its burden, the court must resolve any factual disputes in the plaintiff's favor. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014).

Illinois' long-arm statute stretches as far as the Due Process Clauses of the Illinois and federal constitutions permit. *See* 735 Ill. Comp. Stat. § 5/2–209(c) ("A court may also exercise

jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."); *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) (holding that "there is no operative difference between those two constitutional limits"); *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015) (assuming that Illinois and federal standards for the exercise of personal jurisdiction are coextensive).

The federal Due Process Clause authorizes personal jurisdiction over out-of-state defendants who have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). A defendant's contacts with the forum state must be such that it could "reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). General jurisdiction is available when a defendant's contacts with the forum state are "continuous and systematic," even when a plaintiff's claims do not arise out of those contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). "[A] court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The "paradigm" for the exercise of general jurisdiction is a corporation's "place of incorporation and principal place of business." *Id.* at 137.

A court may also exercise specific personal jurisdiction over a defendant based on the defendant's contacts with the forum state. *See Helicopteros*, 466 U.S. at 414 & n.8. The Seventh Circuit has identified "three essential requirements" for specific jurisdiction: "(1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland v. Clifton*, 682 F.3d 665, 673 (internal citations omitted). The analysis is not "mechanical or quantitative." *Int'l Shoe*, 326 U.S. at 319. The ultimate question is "whether it is fundamentally fair to require the defendant to submit to the jurisdiction of the court *with respect to this litigation*." *Purdue Research Found. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 780 (7th Cir. 2003) (emphasis in original).

Savis' burden of proof on personal jurisdiction would increase if an evidentiary hearing were held on the issue. "[W]here . . . there has been no hearing on the matter, the plaintiff's burden is to set forth a prima facie showing of [personal] jurisdiction." *John Crane, Inc. v. Shein Law Center, Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018) (citing *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014)). A plaintiff's burden increases if the court holds an evidentiary hearing on personal jurisdiction. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014). When a hearing is held, "'the plaintiff must establish jurisdiction by a preponderance of the evidence.'" *Id.* (quoting *Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003)). The parties do not discuss the possibility of holding a hearing here, however, and so the court implies nothing about Savis' likelihood of success if any such hearing were held.

**B. Contractual Waiver of the Defense of Lack of Personal**

The parties debate whether Cardenas' contacts with Illinois are sufficient to exercise specific personal jurisdiction over Cardenas. A minimum contacts analysis turns out to be unnecessary, however, because Cardenas agreed to waive objections to an Illinois or Florida court exercising personal jurisdiction over him when he signed his most recent employment agreement on or around June 6, 2018. *See* ECF No. 1-3 at 6–7 ¶ 8.

The Supreme Court and Seventh Circuit have repeatedly held that, in the words of *IFC Credit Corp. v. Aliano Bros. Gen. Contractors, Inc.,* "since a defendant is deemed to waive (that is, he forfeits) objections to personal jurisdiction or venue simply by not making them in timely fashion, a potential defendant can waive such objections in advance of suit by signing a forum selection clause." 437 F.3d 606, 610 (7th Cir. 2006) (quoting *Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 375 (7th Cir. 1990)); *accord M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 11 (1972) ("[I]t is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court to permit notice to be served by the opposing party, or even to waive notice altogether.") (quoting *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311 (1964)) (alterations omitted); *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005) ("'[P]ersonal jurisdiction is waivable and that parties can, through forum selection clauses and the like, easily contract around any rule we promulgate.'") (quoting *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1280 (7th Cir. 1997)). Under these decisions, a pre-suit, contractual waiver of a personal jurisdiction objection will be enforced "unless it is subject to any of the sorts of infirmity, such as fraud and mistake, that justify a court's refusing to enforce a contract." *IFC Credit,* 437 F.3d at 610 (quoting *Nw. Nat'l*, 916 F.2d at 375).

Cardenas acknowledges that forum selection clauses waiving personal jurisdiction objections are ordinarily enforceable. He argues in his reply that the forum selection clause here would not be enforceable under Illinois law because his employment contracts were offered to him on a "take it or leave it" basis, making the clause unenforceable as an adhesion contract. He relies primarily on *Williams v. Illinois State Scholarship Commission,* 563 N.E.2d 465, 487 (1990). *See also Cross v. Schneider Fin., Inc.*, 2001 WL 1558297, at *4 (N.D. Ill. 2001) (cited by Cardenas).

Savis has put its intention to enforce the contracts at issue here front and center since it filed its complaint, so Cardenas cannot plausibly claim that he was surprised by Savis' efforts to enforce the clause consenting to personal jurisdiction in his response. For this reason, Cardenas waived, for purposes of the present motion to dismiss, his challenge to the enforceability of the forum selection clause by making them for the first time in his reply.

Putting waiver aside, Savis has made a prima facie showing that the clause is enforceable. Cardenas presumes that Illinois law applies to determine the enforceability of the forum selection clause here, but Savis has made a prima facie showing that Florida (or another state's) law may govern. One district court in the Seventh Circuit has characterized the precise question here, "whether the forum state or another state's law should apply to enforceability of the forum selection clause" when analyzing personal jurisdiction, as an open one. *Zimmer, Inc. v. Sharpe*, 2009 WL 1424199, at *4 (N.D. Ind. May 15, 2009). The Seventh Circuit has more than once suggested that the answer may be that the law selected by a valid choice of law clause determines whether a forum selection clause is enforceable. *See Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 438 (7th Cir. 2012) (not reaching question but stating that presence of choice of law clause (Mexico) and forum selection clause (Illinois) in contract "implie[d] that the

law governing the enforceability of the forum selection clause is Mexican law, since the clause is, obviously, a term in the contract"); *Abbott Lab. v. Takeda Pharm. Co. Ltd.,* 476 F.3d 423 (7th Cir. 2007) (suggesting, but not holding that "[s]implicity" argues for applying the same law that governs the rest of the contract when deciding whether a forum selection clause is enforceable); *Zimmer*, 2009 WL 1424199, at *4–5 (declining to decide this question). Assuming that rule governs, an application of Illinois choice of law principles would be the next step. As explained in Part IV.A.1, *infra*, the outcome of that analysis is far from clear. The present briefing and evidentiary record do not adequately present the issue. For now, it suffices to say that, although Savis has a somewhat diminished likelihood of success in showing that Florida law will govern, it has made a prima facie showing sufficient to survive a motion to dismiss before an evidentiary hearing.

Furthermore, assuming, for the sake of argument, that Illinois law controls the enforceability question, Cardenas does not adequately discuss the factors Illinois courts consider when determining whether a forum selection clause is unenforceable in his reply, ECF No. 40. "In deciding whether a forum-selection clause is unreasonable, Illinois courts consider the following factors: (1) which law governs the formation and construction of the contract, (2) the residency of the parties involved, (3) the place of execution and/or performance of the contract, (4) the location of the parties and witnesses participating in the litigation, (5) the inconvenience to the parties of any particular location, and (6) whether the clause was equally bargained for." *Cross*, 2001 WL 1558297, at *3 (citing *Calanca v. D & S Mfg.*, 510 N.E.2d (1987)).

Cardenas' remaining enforceability arguments concern the noncompetition clauses and an argument that Illinois choice of law principles require application of California's law rather than Florida's. Cardenas' pre-suit waiver of his personal jurisdiction defense must therefore be

given effect at this stage, and Cardenas' motion to dismiss for lack of personal jurisdiction must be denied.

### III. Standard for Issuing a Temporary Restraining Order

Temporary restraining orders and preliminary injunctions serve different, though related, purposes. *Triumph v. Ward*, 2011 WL 6754044, at *3 (N.D. Ill. Dec. 22, 2011). To be sure, they have the same basic, "equitable purpose[,] . . . minimiz[ing] hardship to the parties pending the ultimate resolution of the lawsuit." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, 1998 WL 122780, at *1 (N.D. Ill. Mar. 13, 1998) (citing *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)). But by definition, a TRO precedes any preliminary injunction and "'is issued to preserve the status quo before a preliminary injunction hearing may be held.'" *Triumph*, 2011 WL 6754044, at *3 (quoting *Qualcomm, Inc. v. Motorola, Inc.*, 179 F.R.D. 580, 583 (S.D. Cal. 1998)). Federal Rule of Civil Procedure 65 permits a TRO to be effective for no more than 14 days. Fed. R. Civ. P. 65(b)(2). It can be extended at most once for another 14 days upon a showing of "good cause." Fed. R. Civ. P. 65(b)(2); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) (a TRO is effective "just so long as is necessary to hold a hearing, and no longer;" discussing ex parte TRO's); *Coca–Cola Co. v. Alma–Leo U.S.A., Inc.*, 719 F. Supp. 725, 726–27 (N.D. Ill. 1989). Temporary restraining orders often issue without notice to the opposing party, *Coca-Cola*, 719 F. Supp. at 726, and Federal Rule of Civil Procedure 65 includes a number of procedural safeguards when a TRO is sought without notice to the opposing party. S*ee* Fed. R. Civ. P. 65(b); *see also Granny Goose Foods*, 415 U.S. at 438–39 ("[O]ur entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute.").

Rule 65 sets no outer limit on how long a preliminary injunction can be effective. *See* Fed. R. Civ. P. 65(d). "[T]he 'purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (per curiam) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Pretrial discovery often takes years, *see, e.g., id.*, and orders granting or denying a preliminary injunction may be appealed immediately, *see* 28 U.S.C. § 1292(a)(1), while an order granting or denying a TRO generally may not. *Chicago United Indus. Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006).

Though the court heard evidence at a TRO hearing, the operative question is still whether the status quo should be preserved until a preliminary injunction hearing can be held. At an emergency hearing held the day after Savis filed its motion for a TRO, the court determined that Rule 65(b)'s requirements had not been satisfied and ordered Savis to give notice to Cardenas of the TRO. Minute Entry, Sept. 28, 2018, ECF No. 14. Savis did so, but only a limited hearing has been held. The court heard some argument on October 3, 2018, when Cardenas appeared pro se, but that argument was limited to a presentation by Savis' attorney of its position. Cardenas elected to move the court to recruit a lawyer to represent him rather than respond pro se, *see* Def.'s Mot. Att'y Representation, ECF No. 19. The court recruited counsel for Cardenas after the hearing, ECF No. 20. At a hearing held a week later on October 10, 2018, plaintiff and defendant, now represented by counsel, called one witness each and presented some argument. Notably, however, Cardenas' former immediate supervisor, Timothy Mussman, on whose affidavits Savis' motion is primarily based, could not attend the October 10 hearing, though Savis' lawyer implied that he would have liked "to get [Tim Mussman] here." Tr. at 40:7–9. The court cannot predict what evidence would be presented at a preliminary injunction hearing,

but Savis' witness agreed that Mussman had knowledge of Cardenas' day-to-day activities the witness lacked. *See id. at* 40:5–6. As the court observed at the hearing, Savis' witness did not know what Cardenas worked on "day to day." *Id.* at 39:22–40:4 (witness agreed that he was "too meta," meaning supervisory, to provide the needed testimony). Given the limited nature of the evidence presented, Savis' motion for TRO cannot be treated as the functional equivalent of a preliminary injunction motion. Put precisely, then, the question must be framed in terms of whether the TRO should be issued to preserve the status quo until the parties and the witnesses they appear to want to call can be heard at a full preliminary injunction hearing that must occur in 28 days unless the parties consent to keep the TRO in effect for longer. *See Coca-Cola*, 719 F. Supp. at 727. Mindful of the different roles TRO's and preliminary injunctions play, the court recites what Savis must establish to win a TRO.

Like a preliminary injunction, "a temporary restraining order 'is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing.'" *Checker Car Club of Am., Inc. v. Fay,* 262 F. Supp. 3d 621, 626 (N.D. Ill. 2017) (quoting *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008)); *Sw. Airlines Pilots' Ass'n v. City of Chicago*, 186 F. Supp. 3d 836, 839 (N.D. Ill. 2016) (quoting *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)). To obtain a TRO, Savis must make "a threshold showing: (1) that the movant has some likelihood of success on the merits of the underlying litigation; (2) irreparable harm to the plaintiff; and (3) no adequate remedy at law exists." *Checker Car*, 262 F. Supp. 3d at 626 (quoting *Illusions Too Reality, LLC v. City of Harvey*, 2003 WL 260335, at *4 (N.D. Ill. Feb. 4, 2003). The court must consider the balance of harms if this threshold showing is made by weighing "the harm to the movant if the injunction is not issued against the harm to the

defendant if it is issued improvidently and [by] consider[ing] the interest of the public in whether the injunction is to be granted or denied." *Id.* (same quotation); *see also Stuller, Inc. v. Steak N Shake Enter.,* 695 F.3d 676, 679 (7th Cir. 2012).

The court "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010); *Ill. League of Advocates for Developmentally, Disabled v. Ill. Dep't of Human Servs.*, 2014 WL 3605633, at *15 (N.D. Ill. July 21, 2014).

### IV. Likelihood of Success on the Merits

On Savis' likelihood of success on the merits, the parties disagree sharply about whether Savis will be able to show that the non-competition clause is enforceable under Florida law. Before reaching that question, the court considers a threshold choice of law dispute. Analysis of both issues leads the court to conclude that, considering only the present record, Savis has not shown a likelihood of success on the merits.

### A. Choice of Law

As pleaded in Savis' complaint, this court's subject matter jurisdiction comes exclusively from the diversity statute, 28 U.S.C. § 1332(a). ECF No. 1 at 2. A federal court sitting in diversity ordinarily applies the choice of law rules of the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 774 (7th Cir. 2014) (citations omitted). Under Illinois choice of law rules, a contract's

choice of law clause will be respected "as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004) (citing *Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir. 2000); *see also Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015) (stating that a choice-of-law clause will be honored "unless the parties' choice of law would violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen state") (citation omitted).

Here, the pertinent clause of the contract selects Florida law, so that law governs under the general rule. Cardenas does not contend that he did not sign the contracts containing the choice of law clauses, so unless there is an exception, Illinois' general rule enforcing a choice of law clause applies.

Cardenas argues that one such exception applies. Applying Illinois choice of law rules, the Seventh Circuit has held that the general rule has at least two exceptions. *See Hendricks v. Novae Corp. Underwriting, Ltd.*, 868 F.3d 542, 545 (7th Cir. 2017); *see also La. Firefighters' Ret. Sys. v. N. Trust Inv., N.A.*, 312 F.R.D. 501, 508 (N.D. Ill. 2015) (citing *Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Ill.*, 568 N.E.2d 9, 14 (Ill. App. Ct. 1990)). The first focuses on the public policy of the state whose law was selected by the parties. "The law chosen by the parties cannot create a result that is contrary to the chosen state's fundamental public policy." *Hendricks*, 868 F.3d at 545 (citing *Fulcrum Fin. Partners*, 230 F.3d at 1011). Neither party argues that enforcing the choice of law clause here would offend Florida's public policy, so only the second is at issue. *See La. Firefighters*, 312 F.R.D. at 508.

Illinois courts adopted the second exception from § 187 of the Restatement (Second) of Conflict of Laws: "the law chosen by the parties cannot create a result that is contrary to the

'fundamental policy of a state which has a materially greater interest' in the subject matter of the litigation." *Hendricks*, 868 F.3d at 545 (quoting *Int'l Surplus Lines*, 568 N.E.2d at 14, which in turn quotes § 187 of the Restatement). To determine whether another state has a materially greater interest in the subject matter of the litigation, Illinois courts consider the same factors they use in the absence of a forum selection clause to decide which state has the most significant relationship to a contract dispute—the determinative question in the absence of a choice of law clause. *Compare id.*, with *Watters v. Check Cashiers, Inc.*, 202 F.3d 276, 2000 WL 10277, at *3 (7th Cir. January 5, 2000) (unpublished, table decision). Those factors are: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Hendricks,* 868 F.3d at 545 (citing § 187 of the Restatement (Second) of Conflict of Laws); *Watters*, 202 F.3d 276, 2000 WL 10277, at *3 (citations omitted).

Savis contends that Illinois' choice of law principles do not require consideration of these factors here. To substantiate its contention, Savis identifies *Hall v. Sprint Spectrum L.P.*, 876 N.E.2d 1036 (Ill. App. 2007) as the only case Cardenas cites in support of his position, and it argues that the Hall court conducted no § 187 analysis. *See* Reply 1–3, ECF No. 35.

Savis misreads *Hall*. The *Hall* court considered a provision choosing Kansas law contained in a form adhesion contract drafted by a major cell phone provider. *See Hall*, 876 N.E.2d at 1041–42 (characterizing contract as "adhesion contract"). Rather than skip the issue as Savis suggests happened, the *Hall* court set forth the text of § 187. *Id.* at 1041. The *Hall* court did not need to perform an extensive § 187 analysis, however, because no party argued for one. *See id.* at 1041–42 ("[T]here is no argument here that the Illinois constitution or legislative

enactments articulate a public policy against applying a foreign state's consumer protection laws or that Illinois has a 'materially greater interest' in the litigation than Kansas or Missouri."). Savis points to *Hall's* discussion of two Illinois Supreme Court cases as supplanting the § 187 analysis, Reply 2–3, but *Hall* discussed both cases when addressing the defendant's quite separate arguments that "*Hall's* claims are 'noncontractual' and, therefore, that the choice-of-law provision should not apply to them," *Hall*, 876 N.E.2d at 1042. *See id.* at 1042–43 (discussing *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (2005), and *Martin v. Heinold Commodities, Inc.,* 510 N.E.2d 840 (1987)). *Hall*, contrary to Savis' contentions, supports Cardenas' position that Illinois follows § 187 of the Restatement where parties adequately raise the issue.

Illinois and Seventh Circuit cases confirm that Illinois follows § 187 of the Restatement, though not rigidly. When it says that Cardenas cites only *Hall* on this issue, Savis overlooks Cardenas' repeated reliance on *Maher & Assoc., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1006 (Ill. App. Ct. 2d Dist. 1994). *See* Def.'s Resp. 9–10, ECF No. 29. *Maher* confirms that § 187 applies in Illinois and also that it is not a rigid rule. *See id.* The *Maher* court performed a "most significant relationship" analysis and determined Texas law would govern, but the Illinois appellate court decided not to choose Texas law. *Maher*, 640 N.E.2d at 1006. As the court stated, "the analysis contained in the Restatement is a guide for courts; it is not black-letter law to be upheld against all other considerations." *Id.* The § 187 analysis gave way to Illinois public policy in *Maher* because applying Texas law could have "thwart[ed] the strong public policy of protecting sales representatives in Illinois, because Texas has no law which provides the strongest protection offered by the [Illinois] Sales Act." *Id. Maher* does not permit the court to bypass the question of whether a state other than Florida has a greater interest in the subject

matter of this litigation, however. Rather, the *Maher* court began by answering that question and then considered whether Illinois' public policy trumped the parties' choice of law. *See Maher*, 640 N.E.2d at 1006; *see also English Co. v. Nw. Envirocon, Inc.,* 663 N.E.2d 448, 461 (Ill. App. Ct. 1996) (citations omitted); *Int'l Surplus Lines,* 568 N.E.2d at 14 (paraphrasing § 187). As further confirmation from binding authority, the Seventh Circuit performed a § 187 analysis when applying Illinois choice of law principles to a choice of law clause in *Hendricks*, *supra*, 868 F.3d at 545–46. Under this authority, a § 187 analysis will likely be required on the merits of Savis' contractual claims.

Before conducting a preliminary analysis, the court pauses to emphasize that Savis confines its discussion of choice of law principles to its contractual claims. *See* Mem. Supp. Mot. for TRO 4, ECF No. 11 (arguing that "Florida will govern the issues of breach of contract and the enforceability and application of the covenant not to compete"). Illinois choice of law principles require the court to analyze each claim, determine what type of claim it is "(tort, contract, etc.)[,] and examine, for each separate claim" how the applicable factors and public policy apply. *Erickson v. Baxter Healthcare, Inc.*, 94 F. Supp. 2d 907, 910–11 (N.D. Ill. 2009) (citing *Fredrick v. Simmons Airlines, Inc.* 144 F.3d 500, 503–4 (7th Cir. 1998) and *Jones v. State Farm Mut. Auto. Ins. Co.*, 682 N.E.2d 238, 249 (1997)); *see also Underground Sol., Inc. v. Palermo*, 41 F. Supp. 3d 720, 722 (N.D. Ill. 2014) (". . . Illinois follows the doctrine of dépeçage, which 'refers to the process of cutting up a case into individual issues, each subject to a separate choice-of-law analysis.'" (quoting *Chi v. Loyola Univ. Med. Ctr.,* 787 F. Supp. 2d 797, 801 (N.D. Ill. 2011))). Because Savis has not attempted to conduct a choice of law analysis on his other claims and the issue has not been raised by Cardenas in his response, the court implies nothing about what law applies to Savis' noncontractual claims.

*1. The 'Most Significant Relationship' Factors*

Under the analysis required by § 187, Savis has not shown that it is likely to succeed in establishing that Florida has the most significant relationship to its contractual claims. Savis points to two alleged contacts with Florida: Savis' incorporation in Florida and the fact that the contracts Cardenas has admitted to signing contain clauses consenting to venue and personal jurisdiction in Florida as well as a clause selecting Florida law to govern the contracts. Reply 3–4 (citing Compl. ¶ 3; 3d Mussman Aff. ¶¶ 3, 15; Tr. at 14–15) (other citations omitted).

The other contacts Cardenas has identified likely point away from Florida, though it would be premature to decide whether they point to California, Kansas, or Illinois. The first two factors—the place of contracting and contract negotiation—favor California, Illinois, or, less likely, Texas. Cardenas avers that he resided in California when he spoke with Savis' management in Chicago by phone and video conference in 2016 before he signed the contracts. Cardenas Decl. ¶¶ 2–6, 8. In its reply, Savis belatedly raises a question about Cardenas listing a Texas address during the hiring process. *See* 3d Mussman Aff. ¶ 11. For present purposes, what matters is that this fact, if true, points away from Florida.

As for the third and fourth factors—the place of performance and location of the subject matter of the contract—it is undisputed that Cardenas performed no work for Savis in Florida. Mussman avers that Cardenas initially worked at a client site in California before he was assigned to Pfizer. 3d Mussman Aff. ¶ 12. Assuming that is so, Cardenas was working in Kansas (though he may have been in California) when he signed the latter agreements Savis seeks to enforce. Some evidence here points to performance of the contract within Illinois. While Cardenas worked on the Kansas project, in Savis' words, he "communicated with Savis' main office in Chicago to report, update, and coordinate with Savis on the projects he was

assigned on a daily basis." 3d Mussman Aff. ¶ 17. The only mention of Florida, however, is the averment that the company car provided to Cardenas at all relevant times was registered in Florida, insured by Florida, and maintained by the Savis Florida office. *See id.* ¶¶ 15, 17, 24. There is also a factual dispute over how frequently Cardenas travelled between California and Kansas after he began working on the Pfizer project. *Compare id.* ¶¶ 12, 17, *with* 3d Mussman Aff. ¶ 15. Even if this dispute goes Savis' way on the merits, Cardenas performed no work for Savis in Florida, Cardenas Decl. ¶ 17. On this record, factors three and four therefore favor California, Kansas, or perhaps Illinois, but not Florida.

That leaves the final factor—"the domicil, residence, nationality, place of incorporation and place of business of the parties." *Hendricks*, 868 F.3d at 545 (citation omitted). The parties do not discuss their nationalities. On the one hand, Savis is incorporated in Florida, 3d Mussman Aff. ¶ 3, so that fact favors Florida. On the other hand, Savis keeps its "principle place of business" in Chicago. *Id.* Savis' Accounting, Finance, Project Management, Corporate Account Support Team ("CAST" Team), and Human Resources all are located in its Chicago headquarters, *id.* ¶ 24, again pointing to Illinois law. Unfortunately for Savis, it discusses Cardenas' residences but not his domicile. As already mentioned, there is some dispute about what residence Cardenas occupied when he applied for a job with Savis; this dispute points to Texas or California, not Florida. There may also be a dispute over how frequently Cardenas travelled between California and Kansas while working on the Pfizer project. The record is not well enough developed for the court to determine where Cardenas intended to remain permanently, however, but the answer at this stage appears to be California. "'[D]omicile * * * has been defined as 'the place where a person lives and has his true, permanent home, to which, whenever he is absent, he has an intention of returning.'" *Thomas v. Chicago Transit Auth.*, 24

N.E.3d 245, 255 (Ill. App. Ct. 1st Dist. 2014) (quoting *Fagiano v. Police Bd.*, 456 N.E.2d 27 (1983)) (other citations omitted) (asterisks in original). The evidence the court has of Cardenas' domicile presently points slightly to California. Regardless of what addresses Cardenas listed as his residence, Savis footed the bill for Cardenas' housing in Kansas, 3d Mussman Aff. ¶ 4, suggesting that Cardenas did not intend to remain in Kansas indefinitely. What is more, Cardenas avers that he is registered to vote in California, that he has a California driver's license, and that his "permanent residence" is in California, Cardenas Decl. ¶¶ 2–4. These facts point to California as Cardenas' domicile. *See generally In re Husain*, 533 B.R. 658, 694 (Bankr. N.D. Ill. 2015); *Thomas*, 24 N.E.3d at 256. Balancing the evidence the court has of Savis' state of incorporation, Savis' principle place of business, and Cardenas' domicile, the fourth factor leans slightly toward Florida but considerably more toward either California or Illinois.

Looking at the factors holistically, it becomes clear that Savis has a relatively low likelihood of success in demonstrating that Florida has the most significant relationship to its contract-based claims. The court does not mechanically count contacts when conducting a choice of law analysis under Illinois law. *Smith v. I-Flow Corp.*, 753 F. Supp. 2d 744, 747 (N.D. Ill. 2010) (citing *Townsend v. Sears, Roebuck & Co.,* 879 N.E.2d 893, 901–02 (2007)). The parties have not briefed how the contacts with California, Kansas, and Illinois should be weighed,[4] and the complexity of the legal issue as well as the myriad facts that may yet bear on the analysis counsel against going further than a pronouncement that Savis faces a steep uphill climb in showing that Florida has the most significant relationship to its contractual claims.

---

[4] In its reply, Savis briefly argues that Illinois or Kansas has the most significant relationship. *See* ECF No. 35 at 4–5. Because they are raised for the first time in a reply, these arguments are waived for purposes of Savis' motion for a TRO. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018). Savis remains free to pursue these arguments in the future or at a later stage of these proceedings. *See, e.g., id.*

*2. The Public Policy of the State with the Most Significant Relationship to the Dispute*

That is not the end of the matter, however, because Cardenas can avoid the forum selection clause only if another state has "'a materially greater interest' in the subject matter" and applying Florida law offends that state's "fundamental policy." *Hendricks*, 868 F.3d at 545 (quoting *Int'l Surplus Lines*, 568 N.E.2d at 14. Cardenas points to section 16600 of the California Business and Professions Code, which, in the words of the case Cardenas cites, "has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when employment has terminated, unless necessary to protect the employer's trade secrets." *SG Cowen Sec. Corp. v. Messih*, 2000 WL 633434 at *4 (S.D.N.Y. May 17, 2000) (quoting *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 27 Cal. Rptr. 2d 573, 577 (Ct. App. 1994)). Savis has claimed generally that Cardenas was exposed to its methods and knowledge, but Savis brings no trade secrets claims in its complaint and has not attempted to show that Cardenas possesses a trade secret in its reply. *See* ECF No. 35 at 4–5. Savis cites one Illinois and one Kansas case to show that each state's public policy is not contrary to Florida's law favoring "enforcement of non-competes." *Id.* at 4 (citing *Weber v. Tillman*, 913 P.2d 84, 96 (Kan. 1996) and *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52 (2006)). Cardenas acknowledges that California would enforce a noncompetition clause in some circumstances, but then makes a more specific point, namely that Florida enforces noncompetition clauses in a broader set of circumstances than does California. The Kansas and Illinois cases Savis cites (too late in its reply) do not compare the circumstances in which each state would enforce the clauses at issue. Nor do they speak to what constitutes the public policy of Illinois and Kansas.

Hence the record is too undeveloped for the court to say with much confidence that the §

187 analysis is likely to be resolved favorably to Savis. A thick fog of legal and factual questions envelopes the choice of law question at this stage, and Savis bears the risk from this lack of clarity. It must make a "clear showing" to obtain a TRO. *Checker Car*, 262 F. Supp. 3d at 626 (quoting *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008)). Accordingly, the court finds that the choice of law questions raised by Cardenas modestly decrease Savis' likelihood of success on the merits.

## B. Legitimate Business Interest Under Florida Law

Cardenas also argues that Savis will not be able to show that the noncompetition clause is enforceable even if Florida law applies. Def.'s Resp. 12, ECF No. 29. The court agrees. Florida has a statute governing the enforceability of noncompetition clauses. *See* Fla. Stat Ann. § 542.335. "Section 542.335 does not protect covenants whose sole purpose is to prevent competition per se because those contracts are void against public policy." *White v. Mederi Caretenders Visiting Servs. of Se. Fla.*, LLC, 226 So. 3d 774, 785 (Fla. 2017) (quotation omitted). To be enforceable, the noncompetition restriction must be "reasonable in time, area, and line of business." Fla. Stat Ann. § 542.335.

The Florida statute also provides that "[t]he person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." § 542.335(1)(b). The employer must also "plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." § 542.335(5)(c). The Florida legislature provided a nonexhaustive list of business interests deemed "legitimate." § 542.335(1)(b)(1)–(5). The list includes "[t]rade secrets;" "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets[;]" "[s]ubstantial relationships with specific

prospective or existing customers, patients, or clients[;]" "[c]ustomer, patient, or client goodwill associated with" a trademark or trade name, a geographic location, or a market area; and "[e]xtraordinary or specialized training." *Id.*

Savis argues in its memorandum in support of its motion for a TRO that it has two legitimate business interests: 1) "substantial relationships" with Pfizer, a client, and (2) protection of confidential Savis information about Savis' prices, processes, and business strategies. *See* ECF No. 11 at 5, 7. Cardenas responds that Savis is unlikely to prove that he is competing with Savis and that the training he received was administered by Pfizer rather than Savis. *See* Resp. to Mot for TRO 12, ECF No. 29.

*1. Recitals in Contracts*

Savis points to recitals in Cardenas' employment agreement: (1) "[a]greement is necessary to protect its Confidential Information and prevent interference with its customer relationships," Mem. Supp. Mot. for TRO 7, and (2) "[e]mployee recognizes the Company's legitimate interest in protecting, for a reasonable period of time after employment, existing clients and prospective clients of the Company with which Employee becomes involved or as to which Employee acquires Confidential Information during employment with the Company," ¶ 14. These recitals do not increase Savis' likelihood of showing either interest is legitimate, however, because Florida courts do not treat a recital in a contract that an interest is legitimate as controlling. *See Zodiac Records Inc. v. Choice Envtl. Servs.,* 112 So. 3d 587, 590 (Fla. Ct. App. 2013) ("[A] former employer's customer relationships do not automatically qualify as trade secrets, even if a party's restrictive covenant attempts to characterize them as such." (citation omitted)).

*2. Substantial Customer Relationship*

To determine whether a "substantial customer relationship" exists, Florida courts take a multi-factor approach. "[A]n analysis of Florida case law reveals that a substantial relationship is more likely to exist where there is (1) active, on-going business being conducted; (2) exclusivity; (3) a customer who cannot be easily identified by other competitors in the industry; and (4) an expectation of continued business." *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1340–41 (S.D. Fla. 2016) (numbering added) (collecting cases).

Savis does not discuss these factors. It is clear that Savis' relationship with Pfizer is ongoing (factor one). *See, e.g.,* 1st Mussman Aff. ¶ 17. Nothing in the record directly addresses whether the relationship is exclusive, but SAVIS fears losing the client if Cardenas joins Pfizer, which suggests that it is nonexclusive. *See id.* The third factor cuts against Savis. The client is a large, pharmaceutical company that can be easily identified as a potential client by competitors. *See IDMWORKS*, 192 F. Supp. 3d at 1341 ("[A] large company . . . can easily be identified by competing companies and targeted as a prospective client."). Finally, Savis appears to have a legitimate expectation of future business. *See* 1st Mussman Aff. ¶¶ 17. On this record, then, Savis has only a modest likelihood of showing that it has the sort of "substantial customer relationship" that justifies enforcement of a noncompetition agreement restricting Cardenas from working with a large, easily identifiable client with whom Savis has no exclusive relationship. *IDMWORKS,* 192 F. Supp. 3d at 1340.

*3. Training and Confidential Information*

Nor has Savis shown a particularly great likelihood of showing that it has a legitimate business interest in protecting "confidential business or professional information that otherwise does not qualify as trade secrets." Fla. Stat. Ann. § 542.335(b)(2). Savis describes the

protectable information in broad terms in its briefing.  *E.g.,* Mem. Supp. Mot. for TRO 8 (arguing that Cardenas learned *"*the business-related internal mechanisms of Savis and the understanding of the ins and outs of Savis' mechanisms as a result of his lead and management positions," including "billing information" (citations omitted)).  Mussman's affidavit uses similarly general language.  *See* 2d Mussman Aff. ¶¶ 18, 20.  At the hearing on October 10, 2018, Savis' witness testified Cardenas received training on "Good Management Processes" (GMP), apparently an industry term of art, specific to Pfizer's needs at the Kansas site.  *See* Tr. at 6, 11–12, 19.  As the court noted at the hearing, *see id.* at 21, descriptions at this level of generality do not aid the court in determining whether Savis has a trade secret or protectable information recognized as a legitimate business interest in Florida.  *See GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1334–36 (M.D. Fla. 2010).

Cardenas factually disputes Savis' claims, and the court has no way of resolving that dispute before a preliminary injunction hearing.  Cardenas specifically avers that Pfizer, rather than Savis, administered to him the specialized training with which Savis now claims he is absconding.  *See* Cardenas Decl. ¶ 19.  Cardenas states that he "did not have access to Savis' pricing methods, logistics systems, methods of tracking performance, customer metrics, sales and purchase procedures, operating procedures, confidential financial information, and information regarding Savis' relative performances, service information, and customer negotiation  information." *Id.* ¶ 24.  Furthermore, Cardenas states that he "never participated in meetings concerning Savis' internal business methods and strategies, marketing plans and procedures, or financial activities." *Id.* ¶ 23.

The existence of the factual disputes over who trained Cardenas and whether he had access to the information Savis claims coupled with Savis' failure to identify with any specificity

what the protected information is further convinces the court that it is not likely to succeed on the merits under Florida law. A federal district court sitting in Florida applying § 542.335 has held that "an employer cannot preclude a former employee from using contacts and expertise gained during the former employment" based on a noncompetition agreement. *GPS Indus.*, *supra*, 691 F. Supp. 2d at 1336 (citing *Am. Red Cross v. Palm Beach Blood Bank*, 143 F.3d 1407, 1410 (11th Cir. 1998)). That court held that the employer did not show a substantial likelihood of success in showing that it had a legitimate business interest in protecting allegedly confidential information because it failed to show that the information was a trade secret or otherwise protected. *See id.* at 1335–36. The same holds true for the present record on Savis' motion for a TRO.

## C. Existence of a Fiduciary Duty

Savis repeatedly cites *Quality Carriers, Inc. v. MJK Distrib. Inc.*, 2002 WL 506997 (S.D. Ill. Apr. 3, 2002), arguing that Cardenas has breached a duty of loyalty he owed to Savis. Mem. Supp. Mot. TRO 9. *Quality Carriers* quoted a Florida case articulating this common law rule:

> While in the absence of an agreement, there is normally nothing improper with an agent or employee terminating the employment relationship and proceeding to compete with his former principal or employer, during the ongoing [employment] relationship a common law duty not to engage in disloyal acts in anticipation of future competition [exists].

*Id.* at *9 (quoting *Ins. Field Servs.*, *Inc. v. White & White Inspection & Audit Serv., Inc.,* 384 So. 2d 303, 308 (Fl. Ct. App. 1980)).

*Quality Carriers* did not apply Florida law to an employee's duty of loyalty. In *Quality Carriers*, the court found after a preliminary injunction hearing that the sole shareholder and principle of one of the defendants, MJK, attempted to avoid a noncompetition clause in a contract between MJK and another company by forming a new company at the same location

under his wife's name. *See id.* at *2, 4, 9–10. The contract had an enforceable noncompetition clause, so *Quality Carriers* did not determine whether a duty of loyalty was violated under Florida law. *See id.* at *9–10. This court has already addressed the enforceability of the noncompetition clauses at issue in this case. The *Quality Carriers* court applied Illinois choice of law rules and determined that Missouri law applied to the plaintiff's claim for tortious interference with contract. *Id.* at *8, 10 (analyzing claim under Missouri law). Savis does not suggest that Missouri law governs its tortious interference with contractual relations claim, so its citation to *Quality Carriers* does not establish that it is likely to succeed on that claim.

Furthermore, and consistent with the general rule quoted in *Quality Carriers*, settled Florida law holds that "'an employee does not violate his duty of loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment.'" *Harllee v. Prof'l Serv. Indus., Inc.*, 619 So. 2d 298, 300 (Fla. Ct. App. 1992) (quoting *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. Ct. App. 1981). By way of contrast, examples of acts that violate this duty of loyalty include "using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment." *Fish*, 401 So. 2d at 845 (holding that an employee need not be a managerial employee to violate this duty). Savis does not suggest that Cardenas solicited other Savis employees or customers before he left. Cardenas did not attempt to lure Pfizer away from Savis while he worked there, as far as this court knows, so any acts designed to try to secure a job with Pfizer amount at most to "mere preparation to," compete, which would not have violated Cardenas's duty of loyalty even if he had decided to go out on his own and vie for business with Savis. *Harllee*, 619 So. 2d at 300 (citing *Fish*, 401 So. 2d at 845) (Examples of "mere preparation": opening a new bank account and getting a new phone number). For this additional

reason, the court finds that Savis has not shown it is likely to succeed on the merits of its tortious interference with contractual relationship claim.

## V. Irreparable Injury, Adequate Remedy at Law, And Balance of Harms

### A. Irreparable Injury

Harm that cannot "be fully rectified in a final judgment" qualifies as irreparable injury justifying an injunction. *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1024 (7th Cir. 2017) (citing *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017)); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Savis advances several theories of irreparable injury in its memorandum in support of its motion for a TRO: (1) "potential loss of the Client and other clients;" (2) potential loss of the present and future projects; (3) loss of the agreement's value, making it "worthless" through "lack of enforcement;" 4) "loss of reputation and goodwill with Client;" and (5) the loss of Savis' investment in training Cardenas and developing his knowledge, skills, and abilities as a Savis employee, including proprietary information and business methodologies he was exposed to only after signing a non-disclosure agreement. ECF No. 11 at 10–12. Savis cites no case supporting these theories, and for the most part, enumerates them in conclusory fashion. *See id.* Savis relies on the following averments in Mussman's affidavit:

> Other employee on site will see Cardenas working under the Client rather than Savis, harming goodwill, reputation, and success of project the Data Integrity Project.
>
> . . . .
>
> In the past Savis has lost Project Engineers which nearly bankrupt [sic] the company, loss of its largest client, and loss of prospective clients [such] that [it] is virtually impossible to ascertain precise economic consequences.

1st Mussman Aff. ¶¶ 31-32.  Cardenas argues that SAVIS' alleged injuries are too speculative to justify a TRO.  SAVIS' burden to show that it will suffer irreparable injury without a TRO "requires more than a mere possibility of harm."  *Whitaker*, 858 F.3d at 1045.  The harm need not be certain, however, and the threatened harm does not have to "actually occur before injunctive relief is warranted."  *Id.*  Savis fears that history with its prior client will repeat itself here based on Cardenas' resignation.  *See* ECF No. 11–1 at 10.

Despite the uncertainty of the threatened harm, Savis has established that it faces the threat of an irreparable injury.  The Seventh Circuit has characterized the threatened violation of a non-competition clause as a "canonical form of irreparable harm" precisely because "[t]he injuries that flow from the violation of a non-compete are difficult to prove and quantify." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015) (citing *CertainTeed Corp. v. Williams*, 481 F.3d 528, 529 (7th Cir. 2007)) (citation omitted) (Pennsylvania law).  A departing employee's "breaches, if left unchecked, might cause little harm to [the former employer], or they might cause great harm. But either way, the magnitude and even the existence of the injury will be difficult to discern," making an injunction "the best, and probably the only, adequate remedy."  *Id.* at 667; *see also Environ. Serv., Inc. v. Carter*, 9 So. 3d 1258, 1261 (Fla. Ct. App. 2009) (to the same effect).  Accordingly, Savis has shown that it will suffer irreparable harm without a TRO, notwithstanding its difficulty in proving and quantifying its potential damages.[5]

---

[5] It should be noted that Cardenas, while working for Savis, worked for Pfizer, so the idea that he will give Pfizer information from Savis which Savis does not already have is questionable.  It must also be borne in mind that Cardenas is one single employee, not a competing organization that has a realistic chance of appropriating Savis' business or clients.  Thus, Savis' concern about the effect on other Savis employees of Cardenas' actions is perhaps the key issue.

## B. Balance of Harms

Savis has shown that it faces the threat of irreparable harm for which no adequate remedy at law exists if a TRO is not granted, but its showing leaves the court with many questions that affect the balance of harms. Regarding the possibility of Cardenas' use of confidential and proprietary information, Savis referred repeatedly to "Good Manufacturing Processes" at the October 10, 2018, hearing. *E.g.*, Tr. at 6:11. No effort has been made to explain how Cardenas would be tempted, or able, to use nonpublic information he learned while working for Savis in his new role. *Cf. CertainTeed*, 481 F.3d at 530 (questions relevant to irreparable injury inquiry included whether departing employee would be "tempted to put the [former employer]'s information to use" in his new position and whether that violation could be detected by the former employer). Indeed, Cardenas avers that the client conducted virtually all of the orientation and former training he received when he began working at the Kansas site. Cardenas Decl. ¶ 19.

On this record, the court also cannot tell how realistic are Savis' fears of possible departures of other employees, loss of the Kansas project, loss of the client, losses of prospective business, and insolvency. By way of example, Savis does not tell the court the nature of the allegedly analogous project, the role played by the first resigning project engineer in that project (so it can be compared to Cardenas' role) or provide any details about the client relationship and the way in which other Savis employees left. How, with so little information in the record about the prior incident and the Kansas project can the court determine whether Cardenas' departure presents an analogous risk here? And, assuming the analogy holds, how can the court assess the severity of that risk? To date, Savis has presented no evidence that any specific Savis employee

had done more than ask about Cardenas' departure.  *See* Tr. at 51:16-23.  The court cannot tell from this record how real the threat is.

On the other hand, the court can say with considerably greater certainty that enjoining Cardenas from working for Pfizer during a preliminary injunction hearing is likely to harm him substantially.  *See Mintel Int'l Grp. v. Neergheen*, 2008 WL 2782818, at *6 (N.D. Ill. July 16, 2008) (citing *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *4 (N.D. Ill. December 3, 2004)) (denying motion for TRO enforcing non-competition clause).  This court found in its order granting Cardenas' motion for recruitment of counsel that depriving Cardenas of his income would likely render him effectively impecunious.  Weighing this concrete threat of irreparable harm against the present record's lack of specificity about the magnitude of the danger SAVIS faces and its modest showing of a likelihood of success on the merits, the balance tips, at least at this point, in favor of Cardenas.  *See Mintel Int'l*, 2008 WL 2782818, at *7.

## VI. Conclusion

For the reasons stated, plaintiff's motions for a temporary restraining order, ECF Nos. 8 & 10, and defendant's motion to dismiss for lack of personal jurisdiction, ECF No. 30, are denied.


Date:   October 24, 2018                    _____/s/_____
                                            Joan B. Gottschall
                                            United States District Judge