## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Savis, Inc.,

    *Plaintiff,*

v.

Neftali Cardenas,

    *Defendant.*

No. 18 CV 6521

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

Plaintiff Savis, Inc. ("Savis") seeks to enforce its non-compete agreement against its former employee, Defendant Neftali Cardenas ("Cardenas"), who purportedly breached the agreement by leaving Savis for Pfizer. [Dkt. No. 1.] This case comes to the Court with a long procedural history. Most recently, the Court granted in part and denied in part Savis's first summary judgment motion, finding liability as to Count I for breach of Cardenas's employment contract. [Dkt. No. 170.] Savis later filed a second summary judgment motion for attorney's fees as to Count I and Cardenas filed a "motion to dismiss" (more accurately, a summary judgment motion), both of which the Court denied without prejudice as premature. [Dkt. No. 194.]

Pending now are two cross-motions for summary judgment. [Dkt. Nos. 198, 207.] For the reasons outlined below, Savis's motion is granted in part and denied in part. As to Count I, summary judgment is granted as to the issue of Savis's legitimate business interest in its non-competition agreement with Cardenas but is otherwise denied on the issues of causation and damages. Summary judgment is also denied as

1

to Counts Two, Three, Four and Five. Cardenas's motion for summary judgment is denied.

## I. Factual Background[1]

### A. The Parties and Contracts at Issue

Savis is an engineering consulting firm that supports the pharmaceutical industry with manufacturing solutions covering engineering, automation, commissioning and qualification, quality oversight and site remediation. [Dkt. No. 217 at ¶ 10.] Cardenas worked as a Capital Project Engineer on the Data Integrity Remediation Project for Savis from approximately 2016 to September 14, 2018. [*Id.* ¶¶ 5–6, 18.]

Two contracts are at issue. The first is a memorandum entitled "Renewal Offer of Employment" ("renewal offer"), dated March 31, 2018, which Cardenas signed on June 5, 2018. [*Id.* ¶¶ 2–3.] The renewal offer was contingent on Cardenas signing a second contract, an employment contract, entitled "Savis Renewal of contract full Agreement NDA, NCA, and NSA" ("employment agreement"). [*Id.* ¶ 3.] In consideration for signing these contracts, Savis increased Cardenas's annual salary by $5,000 to $75,000. [*Id.* ¶ 2.]

---

[1] The following facts are undisputed, unless otherwise noted. In the context of cross-motions for summary judgment, the Court views the facts in the light most favorable to the party against whom the motion under consideration is made. *See Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). Because of the long procedural history of this matter, this Court draws on many of the facts already established in prior orders. *See* [Dkt. No. 194]. Additionally, the Court recently advised Cardenas about the consequences of his failure to amend his responses to Savis's statement of undisputed fact. [Dkt. No. 227.] This was in addition a previous advisement under *Timms* and *Lewis*. [Dkt. No. 157.] Still, Cardenas failed to substantively amend his response. [Dkt. Nos. 218, 229.]

In the renewal offer, "Employee agrees that during Employee's employment with the Company, Employee will:

> 1.1. Owe a duty of loyalty to the Company and will devote Employee's full working time, attention and efforts to the business and affairs of the Company.
> . . . .
> 1.3. Will not directly or indirectly engage in any business activity competitive with the Company's business or divert any business opportunity related to the Company's business form [sic] the Company.
> . . . .
> 1.7. Any dispute arising from this offer or employment will be disputed in the state of Florida under Florida law."

[*Id.*] The employment contract contained a non-compete clause, which provided:

> Employee recognizes the Company's legitimate interest in protecting, for a reasonable period of time after employment, existing clients and prospective clients of the Company with which Employee becomes involved or as to which Employee acquires Confidential Information during employment with the Company. Employee agrees, during the time the Employee is providing services for the Company and for a period of two (2) years after the termination of services, whether termination is voluntary or involuntary, Employee shall not—without the Employer's prior written consent—directly or indirectly, market, offer, sell or furnish any products or services similar to, or otherwise competitive with, those offered by the Company to any client of the Company, or any prospective client of the Company with which Employee was involved or as to which Employee acquired Confidential Information. Employee further agrees, during the time Employee is providing service for the Company and for the two (2) year period after the termination of services, whether voluntary or involuntary, Employee shall not -without the Employer's prior written consent - directly or indirectly, market, offer, sell or furnish any products or services to a competitor of Company if Employee's duties at the competitor are materially similar to those duties of Employee while employed with the Company. Competitors include, but are not limited to, the following companies and their subsidiaries or affiliates: Amgen, Ben Venue Laboratories, Boehringer-Ingelheim, Agilent, SANDOZ, Novartis, Grifols, Stantec, J.M. Hyde, Mangan, Commissioning Agents Inc., Matrix, Wunderlich Malek, Vista Engineering, Quantic, Beepix, PharmEng, ValSource, Kelly Services, CRB, Jacobs, Avexis, Bayer, Genentech, Gilead, Pfizer, Medtronic, Medimune, RTD.

3

> Employee acknowledges that this restriction is necessary because Employee's position with the Employer would make it impossible for Employee to work for a competitor without disclosing the Employer's Confidential Information, interfering with the Employer's customer relationships, or otherwise violating Employee's obligations under this Agreement. Employee further acknowledge that the Employer does business with customers throughout the United States and in foreign countries, so it is impossible to restrict more narrowly the geographic scope of Employee's obligation not to compete with the Employer. The provisions of this Paragraph shall survive the termination of this Agreement for any reason.

[Dkt. No. 200-5 at ¶ 8.] The employment contract also contained a choice of law provision, which states that "[a]ny dispute arising from this offer or employment will be disputed in the state of Florida under Florida law." [Dkt. No. 217 at ¶ 2.]

### B.  Savis's Work and Cardenas's Job Responsibilities

From 2014 to 2020, Pfizer contracted with Savis to perform engineering consulting services for Pfizer's facility in McPherson, Kansas ("McPherson site"). [Dkt. No. 217 at ¶¶ 5, 12.] Savis works primarily with pharmaceutical clients; Pfizer is its "main client." [*Id.* ¶ 12.] As part of its contract with Pfizer, from 2014 to 2016, Savis provided defect monitoring and process improvements for Pfizer's syringe production line, including supporting investigations. [*Id.* ¶¶ 21, 23, 25.]

Savis and Pfizer executed confidentiality agreements requiring Savis to protect Pfizer's confidential information. [*Id.* ¶¶ 11, 19.] In turn, Savis entrusted its employees with confidential information concerning its clients, including Pfizer. [*Id.*] As a result, Savis employees are exposed to Pfizer's confidential information, including confidential information regarding techniques and processes that Savis utilizes at the McPherson site. [*Id.* ¶ 19.] Client confidential information includes

4

client techniques and processes, like its templates, standard operating procedures ("SOPs"), and "all the tools that Savis has used to fulfill their requirements and duties for completing clients' requests." [*Id.* ¶¶ 11, 13.]

In his role as Capital Project Engineer at the McPherson site, Cardenas performed data integrity compliance assessments, developed assessments, prepared reports for Pfizer's "Global Team," provided automation support, and worked with Pfizer personnel to solve the problems he identified. [*Id.* ¶ 18.] Additionally, Cardenas "updated operational SOPs and Batch records to implement audit trail review procedures, critical parameter verification, documentation attribution, back up procedures, periodic reviews, and network trending." [*Id.*] Cardenas also coordinated with Pfizer subject matter experts and the Global Data Integrity team to instruct parties to redo work if needed. [*Id.* ¶ 33.]

The parties dispute some of Cardenas's job duties as Capital Project Engineer. Specifically, the parties dispute whether Cardenas was responsible for earning new business for Savis and for developing an on-site team. [*Id.* ¶ 32.] Savis contends that Cardenas was responsible for earning new business [*id.*], based primarily on an email Cardenas sent on June 4, 2018 to Savis Human Resources stating that he did work "at Pfizer [that] has resulted in an expansion of scope and generated work that is going out until December." [Dkt. No. 142-10 at 1.] Cardenas denies that he was responsible for earning new business or that he "actively engage[ed] or was encouraged to engage in any form of marketing or sales in order to reach new projects." [Dkt. No. 217 at ¶ 32.]

The parties also dispute who provided Cardenas training for his job duties—Savis or Pfizer. Savis maintains that it trained Cardenas on a variety of topics to work as an engineer at the McPherson site. [*Id.* ¶¶ 29, 39.] Savis notes that new employees need to have site-specific knowledge of the processes they work on. [*Id.* ¶ 14.] Therefore new hires (like Cardenas was in 2016) are mentored by Savis engineers. [*Id.*] Additionally, Pfizer required that validation specialists like Cardenas have specific training on validation documents, use of their systems, and standard operating procedures. [*Id.*] Savis maintains that it provided this training, including site-specific "Kaye validator training," Pfizer standards training, and federal and state regulations training. [*Id.*] Cardenas, on the other hand, says that Pfizer trained him, and that Savis did not provide him with training on topics such as how to perform validation or routing documents through client systems; how to use the Kaye Validator; and how to understand key state and federal regulations.[2] [*Id.* ¶ 14, 29, 39.]

The parties also dispute whether Cardenas was exposed to confidential information as part of his work at Savis. Savis contends that Cardenas was, specifically templates and SOPs. [*Id.* ¶¶ 13, 19, 35.] Cardenas's answers on whether he was exposed to Savis's confidential information vary. He concedes that as a part of his job duties at Savis, he updated operational SOPs, which he agrees qualify as confidential information. [Dkt. No. 217 at ¶¶ 18–19.] This is consistent with the

---

[2]    As discussed later in this Opinion, Cardenas does not support these contentions with any evidence even though he was previously warned that the failure to do so would result in facts being deemed undisputed. [Dkt. No. 224.]

Court's prior Order, which found that Plaintiff's job responsibilities included updating SOPs [Dkt. No. 170 at 16–17], and Cardenas's resume, which states that he updated "operational SOPs and Batch records." [Dkt. No. 142-8 at 2.] Other times, however, Cardenas asserts that he was not exposed to confidential information. [Dkt. No. 217 at ¶¶ 19, 35.]

### C.    Cardenas's Resignation from Savis

In approximately July of 2018, Cardenas started to search for a new job at Pfizer. [Dkt. No. 217 at ¶ 31.] Cardenas searched online for Pfizer job openings and applied for a Technical Services Department position. [*Id.*] Cardenas also looked for a current Pfizer employee to talk with about the opening, which lead him to Kevin Hall, a Pfizer employee assigned to the McPherson site. Cardenas approached Hall at his desk and informed Hall that he was interested in a position in the Technical Services Department.[3] [*Id.*] Pfizer hired Cardenas for a full-time position in the Technical Services Department for a salary of $80,000 per year plus bonus and other benefits. [*Id.*] Cardenas did not inform Pfizer during his application process that he had agreed to abide by a confidentiality agreement or restrictive covenant, like a non-compete clause, while working at Savis. [*Id.* ¶ 17.]

On September 14, 2018, Cardenas resigned from Savis without informing Savis that he had accepted a job with Pfizer at the McPherson site. [*Id.* ¶¶ 6, 17.] On September 24, 2018, Cardenas began work at Pfizer as a process engineer in Pfizer's technical services department. [*Id.* ¶ 16.] In that role, Cardenas was assigned various

---

[3]    Cardenas does not dispute these facts, stating only that he perceives that he "applied fairly." [Dkt. No. 217 at ¶ 31.]

7

duties, including process monitoring, defect monitoring, supporting investigations, and assisting in regulatory audits of the U.S. Food and Drug Administration. [*Id.* ¶¶ 22, 24, 26; *see also* Dkt. No. 170 at 17–18.] The Court previously found these tasks were "similar to or competitive with services offered by Savis." [Dkt. No. 170 at 18–19.]

Since 2020, Cardenas has worked as a Process Engineer in Pfizer's Technical Services Department. [Dkt. No. 217 at ¶ 7.] His employment with Pfizer has no end date. [*Id.* ¶ 8.]

### D. Fallout from Cardenas's Departure from Savis

Since Cardenas's departure, Savis has had three projects at the McPherson site that required engineering support. These projects include the Data Integrity Remediation Project (which ended in January of 2020), the CSV Backfill Project, and the Automatic Lab Admin Support Project.[4] [Dkt. No. 217 at ¶¶ 41, 44, 55.]

The parties largely dispute how Cardenas's decision leave Savis for Pfizer affected the relationship between the two companies. Savis argues that its client goodwill with Pfizer was damaged by the delays resulting from Cardenas's departure, and that it lost out on a contracted engineer assigned to the McPherson site due to the time it took to replace Cardenas. [*Id.* ¶¶ 28, 58; Dkt. No. 226-1 at ¶¶ 9–20.] Before his departure, Cardenas billed at $118 per hour for forty-two hours per week. [Dkt. No. 217 at ¶¶ 43, 49.] According to Savis, when Cardenas left for Pfizer, it did not

---

[4]     Cardenas denies ever working on the CSV Backfill or the Automatic Lab Admin Support Projects or ever billing for them. [Dkt. No. 217 at ¶ 47.]

have an engineer to cover his contracted work for the Data Integrity Remediation Project. [*Id.* ¶¶ 42, 45.] Savis and Pfizer agreed by contract that for this particular project, Pfizer would hire and pay for twelve Savis engineers, roles that the parties refer to as "slots." [*Id.* ¶¶ 41, 44–45.] To replace an engineer on an existing Pfizer project, Savis was required to submit the new engineer's credentials for approval. [*Id.* ¶ 30.] It took Savis approximately six months of active recruiting to hire another engineer, Alan Knackstedt, to work at the McPherson site. [*Id.* ¶ 53.] By the time Savis recruited and onboarded Knackstedt, Pfizer had eliminated one of Savis's billed "slots" created by Cardenas's departure. [*Id.* ¶¶ 42, 46, 53.]

Savis also says that Cardenas's departure "prevented new projects from coming into Savis by Pfizer" because his absence caused certain projects intended for Cardenas to complete to be "lost." [*Id.* ¶ 32, 58; Dkt. No. 202-1 at 143.][5] Savis also contends that it could be doing the work Cardenas currently performs at Pfizer because Pfizer hires contractors in its Technical Services Department. [Dkt. No. 217 at ¶ 40.] Savis further alleges that it has incurred a total of $32,540 in attorney's fees and $5,274.11 in costs. [Dkt. No. 228 at ¶ 8.]

By contrast, Cardenas denies that Savis was unable to cover his contracted work on the Data Integrity Remediation Project, arguing that he transferred his responsibilities to or was replaced by Mark Dieringer, Joel Kennedy, or Henry Capuano. [Dkt. No. 217 at ¶¶ 28, 30, 42, 45; Dkt. No. 229-2 at ¶ 14.] Savis denies this,

---

[5] The Court uses the internal pagination of deposition transcripts, as the CM/ECF pagination does not appear on these exhibits.

arguing that Dieringer could not take on the entirety of Cardenas's billing as a current full-time employee, Capuano was pulled from another project and began work at the McPherson site in October 2018, and Kennedy was a project manager, not an engineer, who could not replace Cardenas. [Dkt. No. 228 at ¶¶ 10–18.] Cardenas denies that Savis's personnel are properly trained for his current role at Pfizer. [Dkt. No. 217 at ¶ 40.]

## II.   Procedural Background

On September 25, 2018, Savis filed suit, raising five claims for relief. [Dkt. No. 1.] The claims include breach of the non-compete agreement (or renewal offer) (Count One), breach of employment contract (Count Two), breach of fiduciary duty (Count Three), breach of the implied covenant of good faith and fair dealing (Count Four), and tortious interference with contracts, business relationships, and expectations (Count Five). [*Id.* ¶¶ 13–22.]

On June 20, 2020, Savis moved for summary judgment for the first time. The Court entered partial summary judgment in Savis's favor. [Dkt. No. 170.] First, the Court found that Florida law governs all of Savis's claims. [*Id.* at 10–13.] Because Savis did not apply Florida law to its arguments concerning Counts Two through Five, the Court declined to resolve those claims. [*Id.* at 11–13.]

Because Savis did apply Florida law to its Count One arguments, the Court addressed those arguments on the merits. [*Id.* at 13–21.] The Court found Cardenas liable for breach of contract under Count One. [*Id.* at 19.] After comparing the services that Savis provided to Pfizer with Cardenas's new position at Pfizer, the Court

concluded that Cardenas was providing "services that are similar to those Savis offers or performs." [*Id.* at 19.] As such, Cardenas had breached his non-compete contained in the renewal agreement. [*Id.*]

This conclusion on liability came with two caveats. First, the Court expressly noted that whether Savis had a legitimate business interest that made the non-competition clause enforceable under Florida law remained an open question. Because this issue had not been presented through adversary briefing, "fact issues precluded summary judgment on other elements of counts I and II." [*Id.* at 14 n.3.]

Second, the Court denied Savis summary judgment as to damages on Count One. [*Id.* at 20–21.] The Court identified a genuine issue of material fact as to causation, namely whether any other Savis personnel "took over Cardenas's responsibilities on the data integrity project," which required Savis to present evidence "that there was in fact another slot Savis could have filled at Pfizer's McPherson facility after Cardenas's resignation." [*Id.* at 21.] And the Court explained that Savis's damages calculations were incorrect under Florida law. [*Id.* at 20.]

Savis moved for summary judgment a second time. [Dkt. No. 183.] The Court denied the motion as "premature" because it only sought attorney's fees on Count One. [Dkt. 194 at 2.] Meanwhile, Cardenas filed a "motion to dismiss," [Dkt. No. 187], which the Court construed as a motion for summary judgment and denied without prejudice to renewal. [*Id.* at 11.]

Now, for the third time, the parties have filed cross-motions for summary judgment, which the Court addresses below. [Dkt. Nos. 197, 207, 226, 229.]

## III.   Legal Standard

The Court should grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). As the Court confronts cross-motions for summary judgment, the Court views the facts in the light most favorable to party against whom the motion under consideration is made. *See Med. Protective Co. of Fort Wayne v., Indiana v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). The Court may not weigh conflicting evidence or make credibility determinations. *See Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Further, the Court must give the nonmovant "the benefit of reasonable inferences from the evidence, but not speculative inferences in [her] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## IV.   Analysis[6]

### A.   Choice of Law

---

[6]   The parties' briefing presents complicated and intertwined issues. Because the briefs address the same counts, the Court resolves the arguments presented in each motion in one section for ease of organization, bearing in mind the standards required of the parties at summary judgment. [Dkt. Nos. 198–199, 207–208.]

Florida state law is the proper choice of law for all of Savis's claims. [Dkt. No. 174 at 10–13.]

## B.    Local Rule 56.1

Local Rule 56.1 governs summary judgment practice in this district. *See generally Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). The Seventh Circuit "has repeatedly recognized that district courts may require exact compliance with their local rules," including the "local rules governing summary judgment." *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (collecting cases). Consistent with the purpose of LR 56.1, however, the court has "broad discretion" to relax or enforce strictly local rules governing summary judgment practice. *Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013) (citing *Modrowski v. Pigatto*, 712 F.3d 1168, 1169 (7th Cir. 2013)); *see also Cracco*, 559 F.3d at 632.

The Court construes Cardenas's most recent filing, entitled "Defendant's Objection to Plaintiff's Motion for Summary Judgment," as if Cardenas were affirmatively moving for summary judgment. [Dkt. No. 229.] *United States v. Antonelli*, 371 F.3d 360, 361 (7th Cir. 2004) (per curiam) ("When determining the character of a pro se filing, . . . courts should look to the substance of the filing rather than its label.") Still, Cardenas has not met his burden to show that he is entitled to summary judgment. In general, Cardenas explains his arguments, but fails to cite to any evidence or supporting caselaw. [Dkt. No. 229 at 7–9.] On prior occasions, Cardenas was instructed how to properly file and support a summary judgment

motion, but his latest submissions still fall short. [Dkt. No. 157 at 9–16 (providing Cardenas an expanded *Timms* notice to explain summary judgment filing requirements); Dkt. No. 194 at 8–9 (reiterating that Cardenas is required to file a Local 56.1(a)(3) statement of undisputed material facts to comply with summary judgment filing requirements); Dkt. No. 206; Dkt. No. 224 at 4.] Because the Court prefers to decide cases on the merits, not on technicalities, it considers the arguments Cardenas raises to the greatest extent possible.

There are problems with Savis's submission, too. For the second time in this case, Savis improperly filed a reply to the statement of undisputed facts. [Dkt. No. 220.] The Court previously warned Savis that a reply to a statement of undisputed material facts is *not permitted* under the Local Rules when the opponent's response lists no additional facts in that pleading. [Dkt. No. 170 at 8.] Despite this warning, Savis again filed a reply to Cardenas's response to the statement of undisputed facts, even though Cardenas listed no additional facts in his LR 56.1(b)(3) response. [Dkt. No. 217, 220.] For the second time, the Court strikes Savis's filing [Dkt. No. 220], and will not consider it. *See, e.g.*, *Levin v. Grecian*, 974 F. Supp. 2d 1114, 1117–18 (N.D. Ill. 2013). The Court's Local Rules are not suggestions. Any future violation of the Local Rules will result in a show cause order.

## C.     Count One: Breach of the Non-Compete Clause

The Court has already found Cardenas liable for breach of the non-compete agreement under Count One. [Dkt. No. 139 at 19.] In this Order, the Court analyzes the remaining elements as to Count One: whether Savis has a legitimate business

14

interest to support its non-competition agreement with Cardenas, causation, and damages.

### 1.    Legitimate Business Interest[7]

Under Section 542.335 of the Florida Statutes, a restrictive covenant, like a non-competition clause, is valid if the employer can prove (1) the existence of one or more legitimate business interests justifying the restrictive covenant, and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer. *See* Fla. Stat. § 542.335(1)(b), (c); *see also Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009). A "legitimate business interest" can include: "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets," "[s]ubstantial relationships with specific prospective or existing customers, patients, or clients," "[c]ustomer, patient, or client goodwill" with certain limitations, or "[e]xtraordinary or specialized training." Fla. Stat. § 542.335(b)(2)–(5). Once an employer establishes a *prima facie* case that there is a legitimate business interest justifying the covenant and that the restraint is reasonably necessary to protect the established interests of the employer, the burden of proof shifts to the employee to show that "the contractually specified restraint is overbroad, overlong, or otherwise not reasonably

---

[7]    Savis's suggestion that Cardenas waived any legitimate business interest argument borders on frivolous. In its prior Order, the Court said, "[b]ecause the issue has not been presented through adversary briefing and fact issues preclude summary judgment on other elements of counts I and II, the court does not decide today whether Savis has a legitimate business interest recognized by Florida law." [Dkt. No. 170 at 14 n.3; see also Dkt. No. 194 at 10–11 ("this court did not rule on several questions concerning the noncompetition clause's enforceability that were hotly contested by Cardenas's former recruited counsel.").]

necessary to protect the established legitimate business interest[s]." *Id.* § 542.335(1)(c). Courts are statutorily required to construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement. *Id.* § 542.335(1)(h).

Cardenas's employment contract, including its non-competition clause, states that while an employee works for Savis and for two years after termination of employment, that employee "shall not—without the Employer's prior written consent—-directly or indirectly, make, offer, sell or furnish any products or services similar to, or otherwise competitive with, those offered by the Company to any client of the Company. . . ." [Dkt. No. 217 at ¶ 9.]

Savis makes several arguments in support of the prongs listed in § 542.335(1)(b)(2)—(5), to establish its legitimate business interest with Pfizer sufficient to support Cardenas's non-competition restriction. [Dkt. No. 141 at 16—22.] The Court concludes that Savis has established a legitimate business interest in the specialized training it provided to Cardenas, which is reasonably necessary to protect its established interests under § 542.335(1)(b)(5). Because an employer need only establish one legitimate business interest under the statute, the Court declines to consider whether Savis has met its burden under any of the remaining prongs.

Training constitutes a legitimate business interest protectable by an injunction only when the training rises to the level of being specialized or extraordinary. Fla. Stat. § 542.335(1)(b)(5). Courts have interpreted "specialized" or "extraordinary" to mean that training must go beyond that typically offered in any given industry.

16

*Autonation Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1306 (S.D. Fla. 2004) (requiring that specialized or extraordinary training under Florida law "exceed[] what would be common or typical in the industry"); *Dyer v. Pioneer Concepts Inc.*, 667 So.2d 961, 964 (Fla. Dist. Ct. App. 1996) (quoting *Hapney v. Central Garage, Inc.*, 579 So.2d 127, 132 (Fla. Dist. Ct. App. 1991)) ("Training is classified as extraordinary when it exceeds 'what is usual, regular, common, or customary in the industry in which the employee is employed.'"). Courts have considered the time dedicated to the training and the specialized nature of the training when determining whether the training is a protected legitimate business interest. *Compare Passalacqua v. Naviant, Inc.*, 844 So. 2d. 792, 797 (Fla. Dist. Ct. App. 2003) (holding that employer failed to demonstrate a legitimate business interest in specialized training where the training program consisted of "two to three hours on each of two consecutive days" and a review of a manual and "generic" sales tactics); *with Balasco v. Gulf Auto Holding, Inc.*, 707 So. 2d 858, 860 (Fla. Dist. Ct. App. 1998) (explaining that a six-month training program with a full time training manager qualified as specialized training sufficient to create a legitimate business interest).

Savis contends that it provided site-specific training from August of 2016 to September of 2018, including how to create validation and outing documents through client systems, Kaye validator training, federal and state regulations, and other enumerated topics like SAVIS Maximo Training, SAVIS Commissioning and Qualification Training 072315, SAVIS EDMQ (Document Management System) Training, SAVIS PDOCS (Document Management System) Training, SAVIS Kaye

Validator 2000 Setup and Use, Training, Pfizer onboarding, and Pfizer onboarding guidance. [Dkt. No. 163 at ¶¶ 26, 58, 62; Dkt. No. 217 at ¶¶ 14, 39.] Cardenas responds by arguing that this evidence is hearsay; that he never used certain of the training modules referenced above; or by simply stating that he disputes the statements. [*Id*.] None of these arguments carry the day. The training itself is not hearsay because it is not evidence offered for its truth. Whether Cardenas used the training is not dispositive of whether he received it. And "mere disagreement with the opponent's factual statement is inadequate unless made with appropriate citation to the record." *Crowder v. Barrett*, No. 17 C 0381, 2022 WL 864519, at *2 (N.D. Ill. Mar. 23, 2022). Given that Savis's training was site-specific and spanned a lengthy period of time, it exceeded what was "usual, regular, common, or customary in the industry in which the employee was employed" so as to qualify as specialized under Florida law. *Dyer*, 667 So.2d at 964. Thus, Savis has established a *prima facie* case that it has a legitimate business interest in its training provided to Cardenas. Fla. Stat. § 542.335(1)(c).

Savis has also provided undisputed evidence that the non-compete is reasonably necessary to protect this interest. Savis notes that this training is required by its clients, including Pfizer, and only provided to contract employees. [Dkt. No. 163 at ¶ 63; Dkt. No. 217 at ¶¶ 29, 34, 38.] Given this, the Court concludes that such a restraint is thus necessary to Savis's legitimate business interest.

In his cross-motion for summary judgment, Cardenas argues that Savis "has not provided admissible evidence that [he received] extraordinary or specialized

training." [Dkt. No. 208 at 4.] But as just discussed, Cardenas has not meaningfully supported this assertion: aside from a general denial that he received training, the only evidence Cardenas offers in support is his affidavit, where he avers that he did not *use* any confidential information or specialized training.[8] [Dkt. 209 at ¶ 2; Dkt. No. 163-1.] Cardenas's supplemental filing fares no better. He simply reiterates his claim that Pfizer, not Savis, provided his training, or cites to contradictory portions of his affidavit. *See generally* [Dkt. No. 229 at 5 ("I did not receive training as a SAVIS [employee] on managing any digitalization of data or key metric analysis or statistical analysis. The training I needed to perform this work was administered by colleagues from Pfizer . . . .").]

The Court finds that there was a legitimate business interest worthy of protection under Florida law. Cardenas's motion for summary judgment on these grounds is denied. [Dkt. Nos. 198–199.]

### 2. Reasonable Scope

Once the party seeking enforcement of a restrictive covenant establishes a legitimate business interests justifying the restriction, the burden shifts to the party opposing enforcement to demonstrate that the restriction is overbroad, overlong, or otherwise not reasonably necessary to protect the interests of the party seeking enforcement. Fla. Stat. § 542.335(1)(c). In his cross-motion for summary judgment,

---

[8]    Cardenas does dispute whether he received certain confidential information, including "SOPS," which at least some of the training documents seem to concern (including SAVIS Data Integrity Training v3.4, SAVIS / Amgen EPD Workshop & Refresher Training v8l SAVIS SOP #4027, SAVIS SOP #4025, SAVIS SOP #4024, and Pfizer LMS (Learning Management System) SOP Training). [Dkt. No. 142 at ¶ 62; Dkt. No. 217 at ¶ 39.]

Cardenas argues that even if Savis has a legitimate business interest, the non-competition clause in Cardenas's employment contract is unduly onerous because the contract has an unreasonable geographic restriction. [Dkt. No. 208 at 6.]

Savis does not meaningfully dispute that the non-compete clause as written is unreasonable in geographic scope. [Dkt. No. 211 at 10.] Rather, it argues that when it first sought summary judgment, it only sought to modify the non-competition clause under Florida law to bar Cardenas from working at the McPherson site. *See* Fla. Stat. § 542.335(1)(h) ("If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests."); *see also Sears Termite & Pest Control, Inc. v. Arnold*, 745 So.2d 485, 486 (Fla. Dist. Ct. App. 1999) (noting that "when . . . [a non-compete] agreement is otherwise valid but lacks a geographic restriction, the courts should supply a reasonable restriction"). This proposed limitation on scope—namely, Pfizer's McPherson site in Kansas—is reasonable, as it directly relates to the legitimate business interest Savis seeks to protect. *See, e.g.*, *Office Depot, Inc. v. Babb*, 2020 WL 1306984, at *3 (S.D. Fla. Mar. 19, 2020) (noting it was reasonable to enjoin former employee "from working for a competitor in the same geographic territory for which she worked on behalf of [employer]").

But the geographic restriction is no longer dispositive because the non-competition restriction has expired. [Dkt. No. 170 at 22 ("[T]his court denies Savis's request for a permanent injunction because the non-competition has facially

expired.").] And according to Savis, it no longer seeks to bar Cardenas from working at Pfizer or any other company; it seeks only monetary damages. [Dkt. No. 211 at 10 ("Plaintiff is no longer seeking to bar Defendant from working at Pfizer or any other company within any other state. Plaintiff is only seeking monetary damages and attorney's fees and cost for its finding of liability.").] Given this posture, the Court concludes the non-competition clause in the employment contract is not unduly onerous.

### 3.     Causation and Damages

Having concluded that Savis has a legitimate business interest in its non-compete and having found Cardenas liable [Dkt. No. 170 at 19], the remaining issues are causation and damages. Under Florida law, Savis "may seek damages for any breaches of the enforceable restrictive covenants in the Agreement, but 'an award of damages for breach of contract is intended to place the injured party in the position he or she would have been in had the breach not occurred.'" *Proudfoot*, 576 F.3d at 1242 (cleaned up) (quoting *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. Dist. Ct. App. 2002)). Under this principle, Savis must prove both that it sustained the losses it claims and that its "lost profits were a direct result of" Cardenas's breach. *Id.* at 1243 (citing *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890, 898 (Fla. Dist. Ct. App. 2007)).

In its prior ruling, the Court found that "Savis fail[ed] to carry its initial summary judgment burden on damages because the damages calculation it proposes ignores basic principles of Florida contract law," namely that damages are to be

computed as net lost profits, not lost revenue, attributable to Cardenas's absence. [Dkt. No. 170 at 20.] Savis was required to prove "both that it sustained the losses it claims and that its 'lost profits were a direct result of' Cardenas's breach." [*Id.* (citing *Proudfoot*, 576 F.3d at 1243).] The Court noted that "Savis has not attempted to estimate its alleged lost profits, so it has failed to carry its initial summary judgment burden." [*Id.*] The Court also explained that Cardenas had presented evidence raising a genuine fact issue as to causation: whether his departure caused Savis to lose any business given his averment that he transferred his responsibilities to others. Because Savis had presented evidence that it "has been unable to find an engineer to replace Cardenas," this left a fact question as to whether Cardenas's breach caused Savis to lose profits. [*Id.* at 21.]

In the most recent round of briefing, Savis maintains that Cardenas's departure left an understaffing of one billing slot "directly reducing the billable hours with reasonable certainty" by "approximately 42 hours per week that Cardenas was billing" for work at the McPherson site. [Dkt. No. 199 at 7.] According to Savis, Cardenas's departure required Dieringer to take over Cardenas's work and it took six months for Savis to hire Knackstedt as Cardenas's replacement. [*Id.* at 8.]

The Court elicited additional information on this issue, explaining that the record was unclear on the roles Capuano, Kennedy, and Dieringer played at Pfizer following Cardenas's departure. [Dkt. No. 224 at 2–3.] The picture is no clearer now than it was when the Court addressed the issue before: Savis insists that Dieringer did not cover all of Cardenas's hours; that Capuano was only able to bill time to Pfizer

starting in October 2018 but could not bill to his original assignment; and that Kennedy was not hired to replace Cardenas. [Dkt. No. 226 at 1–2.] Cardenas still disputes this, maintaining that Dieringer took over his responsibilities; that Capuano provided site support after Cardenas's departure; and that Kennedy was Cardenas's direct replacement. [Dkt. No. 229 at 2.] These factual disputes preclude summary judgment. *See Johnson*, 892 F.3d at 893.

This posture also prevents the Court from resolving Savis's proposed damages calculations, which are subject to change based on the time reasonably attributable to Cardenas's departure and not otherwise covered by other employees. *See Proudfoot*, 576 F.3d at 1245–46. For these reasons, summary judgment is denied as to Count One for breach of a non-compete.

### D. Count Two: Breach of Employment Agreement

Savis argues that it is entitled to summary judgment as a matter of law on Count Two for breach of the employment agreement. [Dkt. No. 199 at 10–14.] A claim for breach of contract under Florida law requires proof of three familiar elements: "(1) a valid contract; (2) a material breach; and (3) damages."[9] *Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLP*, 137 So. 3d 1081, 1094–95 (Fla. Dist. Ct. App. 2014) (quoting *Schiffman v. Schiffman*, 47 So. 3d 925, 927 (Fla. Dist. Ct. App. 2010)); *see also Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (per curiam) (same).

---

[9] Savis defines these elements under Kansas, rather than Florida law, but the elements are the same. [Dkt. No. 199 at 10.]

Cardenas does not dispute that he had a valid contract with Savis in the form of the renewal offer. [Dkt. No. 218 at 4.]

Savis alleges that Cardenas breached his renewal offer in two ways: *first*, by talking to Hall during Cardenas's working hours about a position at Pfizer in violation of his contracted-for duty of loyalty; and *second*, by accepting a job at Pfizer in violation of the renewal offer's requirement not to "directly or indirectly engage in any business activity competitive." [Dkt. No. 199 at 11–13.]

As to its first argument, Savis claims that Cardenas breached the duty of loyalty by discussing his job application with a Pfizer employee, abusing his position "to gain a business opportunity for himself instead of benefiting his employer," [Dkt. No. 199 at 11–12], which resulted in a failure to "devote [his] full working time, attention, and efforts to the business and affairs of [Savis]." [Dkt. No. 217 at ¶ 2]. "To state a claim for a breach of a duty of loyalty, [d]efendants must allege (1) the existence of a duty of loyalty, (2) a breach of that duty, and (3) damages proximately caused by the breach." *OPS Int'l, Inc. v. Ekeanyanwu*, 2023 WL 4350419, at *6 (M.D. Fla. May 11, 2023) (quoting *Martin v. Partsbase, Inc.*, 2020 WL 7495536, at *2 (S.D. Fla. Dec. 4, 2020)).

As to the first element, under the terms of the renewal offer itself, Cardenas owed a duty of loyalty to Savis, thereby promising "to devote [his] full working time, attention and efforts to the business and affairs of the Company." [Dkt. No. 217 at ¶ 2.] But Savis has failed to satisfactorily carry its burden as to breach based on Cardenas's discussion with Hall. [Dkt. No. 199 at 11–12.] Savis cites no caselaw or

24

other authority to suggest that this behavior constitutes a breach, much less a material one. *See Agnelli v. Lennox Miami Corp.*, 2022 WL 4598764, at *1 (S.D. Fla. Sept. 30, 2022) (quoting *Sublime, Inc. v. Boardman's Inc.*, 849 So. 2d 470, 471 (Fla. Dist. Ct. App. 2003)) (noting that "[a] breach is material where it 'goes to the essence of [a] contract'"). An employee does not violate his duty of loyalty "when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment." *Harllee v. Pro. Serv. Indus., Inc.*, 619 So. 2d 298, 300 (Fla. Dist. Ct. App. 1992) (citing *Fish v. Adams,* 401 So.2d 843, 845 (Fla. Dist. Ct. App. 1981)). As explained at the preliminary injunction stage, "Cardenas did not attempt to lure Pfizer away from Savis while he worked there, as far as this court knows, so any acts designed to try to secure a job with Pfizer amount at most to 'mere preparation to,' compete, which would not have violate Cardenas's duty of loyalty even if he had decided to go out on his own and vie for business with Savis." [Dkt. No. 42 at 32.] At most, Cardenas engaged in preparation to take another job. *Harllee*, 619 So.2d at 300 (citing *Fish*, 401 So.2d at 845). This conduct may have breached the terms of the non-compete [Dkt. No. 170 at 19], but it did not breach the duty of loyalty under his renewal offer.

Nor is Savis entitled to summary judgment on its second argument, that Cardenas breached his renewal offer by taking a position at Pfizer, which both diverted work from Savis and occupied a spot that Savis could have filled with its own worker. [Dkt. No. 199 at 11–13.] Savis supports this claim with vague statements like "Cardenas has prevented new projects from coming into Savis by Pfizer," and

certain projects once assigned to Cardenas were lost because he was "no longer with the company." [Dkt. No. 217 at ¶¶ 28, 32]

These arguments are both speculative and disputed. While there is some support for the conclusion that Savis suffered a loss with Cardenas's departure, the record does not reveal that Cardenas "diverted new projects" away from Savis upon his acceptance of a job at Pfizer. [Dkt. No. 199 at 12.] It is unclear how Cardenas's responsibility for "earning new business" at Savis would necessarily translate to his new role at Pfizer, much less constitute evidence that he has earned new projects for Pfizer in his time there. Besides, Cardenas disputes these contentions, [Dkt. No. 217 at ¶ 32], so the Court cannot conclude as a matter of law that Cardenas breached his renewal offer in this way.

As to whether Cardenas provided services that were competitive with Savis, the Court previously found, as a matter of law, that he did. [Dkt. No. 170 at 18 ("Even viewing the evidence in the light most favorable to Cardenas, a reasonable jury would be forced to conclude that Cardenas is providing services similar to or competitive with services offered by Savis.").] While Cardenas continues to dispute the veracity of the Court's conclusion [Dkt. No. 218 at 4], he does so based primarily on the same evidence as he did in his prior filing. [Dkt. No. 164.] The Court sees no manifest error of fact or law sufficient to reconsider the prior decision nor does Cardenas argue that the prior Court made such an error. *See* Fed. R. Civ. Pro. 59; *see also Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

This takes the Court to the question of damages, which the Court is unable to determine given Savis's briefing. At the outset, Savis does not provide legal authority for how to compute damages for a contract breach. [Dkt. Nos. 199, 219, 226.] Even if Savis had provided such authority or any guidance on why it was calculating damages as it was, it does not say whether the damages it requests in Count Two are duplicative of those it requests in Count One. Nor does Savis explain why it requests "ongoing" damages. The Court expressly inquired about this issue, but Savis failed to address it in its supplemental brief. [Dkt. No. Dkt. No. 224 at 2 ("While the Court appreciates that Savis lays out its requested damages in some detail in Count II, Savis provides no explanation for why it requests 'ongoing' damages or whether it seeks a separate damage award apart from Count I.").] Summary judgment is denied on the breach of an employment contract, Count Two.

### E.    Count Three: Breach of Fiduciary Duty

Savis moves for summary judgment on Count Three for breach of the fiduciary duty of loyalty. [Dkt. No. 199 at 15–18.] To show Cardenas breached his fiduciary duty, Savis must show: "(1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010) (quoting *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1342 (M.D. Fla. 2006)). "The duty of loyalty is part of a fiduciary duty, and a breach of a duty of loyalty gives rise to a breach of fiduciary duty claim." *See Valiant Servs. Grp., LLC v. Com. Works, Inc.*, 2022 WL 738471, at

27

*2 (M.D. Fla. Jan. 24, 2022) (citing *Taubenfeld v. Lasko*, 324 So.3d 529, 538 (Fla. Dist. Ct. App. 2021)).

A fiduciary relationship may be either express, such as by contract, or implied "based on the specific factual circumstances surrounding the transaction and the relationship of the parties." *First Nat'l Bank & Trust Co. v. Pack*, 789 So.2d 411, 414 (Fla. Dist. Ct. App. 2001). "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. Dist. Ct. App. 1993) (quoting *Bankest Imports, Inc. v. Isca Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989)). "[A] 'mere employee' of a corporation generally does not occupy a position of trust and owe a fiduciary duty unless he also serves as its agent." *See Mandel v. Howard*, 2012 WL 1069182, at * 5 (S.D. Fla. Mar. 29, 2012) (quoting *Renpak, Inc. v. Oppenheimer*, 104 So.2d 642, 644 (Fla. Dist. Ct. App. 1958)).

As to breach of this duty, "an employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers . . . prior to the end of his employment." *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1149 (M.D. Fla. 2007). However, as noted above, "an employee does not violate his duty of loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment." *Harllee*, 619 So. 2d at 300 (citing *Fish,* 401 So.2d at 845). Examples of acts that violate

28

this duty of loyalty include "using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment." *Fish*, 401 So. 2d at 845; *see also OPS Int'l, Inc.*, 2023 WL 4350419, at *6 ("[A]cts that . . . constitute actual competition include solicitation of business for an employee's personal endeavor, which otherwise the employee had an obligation to obtain for an employer, competing with the employer for customers or employees, and employee behavior leading to the mass resignation of the employer's workforce.").

Genuine issues of material fact preclude summary judgment regarding whether Cardenas was a fiduciary to Savis. Because Cardenas did not agree by contract to be Savis's fiduciary, to conclude that Cardenas is a fiduciary the Court must find that such a duty was implied "based on the specific factual circumstances surrounding the transaction and the relationship of the parties." *Pack*, 789 So.2d at 414. Savis argues that Cardenas was its fiduciary because he was a senior member of the team assigned to the McPherson site, he was responsible for earning new business, coordinated meetings with the team, planned resources, met with subject matter experts, and gave instructions to Pfizer's team. [Dkt. No. 217 at ¶¶ 32–33.] Cardenas admits that he was a senior team member and coordinated team events, met with subject matter experts, and relayed instructions from the Pfizer team, but he disputes other things, including that he earned new business for Savis or stopped new projects from coming to Pfizer after his departure. [*Id.*] At bottom, the parties dispute key facts surrounding whether Cardenas can be considered a fiduciary. And Savis has not provided any record evidence that Cardenas ever served as its agent,

29

which could be potentially dispositive of this issue. *See Mandel*, 2012 WL 1069182, at
* 5. Accordingly, the Court cannot conclude as a matter of law that Cardenas was
Savis's fiduciary.

Nor has Savis demonstrated that Cardenas breached a duty. Savis argues that
Cardenas breached his fiduciary duty by communicating with Hall, then a Pfizer
employee, to further his potential employment at Pfizer and thereby "solicit[ed] a
position with Pfizer." [Dkt. No. 199 at 17.] Savis also argues that Cardenas "used his
position and confidential information of the site operations" to solicit Pfizer. [Dkt. No.
226 at 4.] Cardenas does not dispute talking to Hall but maintains that he obtained
his Pfizer job through proper channels. [Dkt. No. 229 at 5–6.]

The Court has already discussed how these actions do not establish a breach.[10]
Savis cites no caselaw or other authority to suggest that Cardenas's behavior was a
breach, much less a material breach. *See Agnelli*, 2022 WL 4598764, at *1. Indeed,
the Court's analysis at the temporary injunction phase still holds. [Dkt. No. 42 at 32
("Cardenas did not attempt to lure Pfizer away from Savis while he worked there, as

---

[10]        Savis implies that Cardenas would breach his fiduciary duty working at a
competitor because he would necessarily utilize his specialized training gained at Savis to
any new employer. [Dkt. No. 199 at 17 ("Not only was Cardenas able to abuse his position at
Pfizer, but gained the necessary training and skills that he would otherwise not possess
without his position at Savis.").] Savis cites no caselaw for this assertion. [*Id.*] Moreover,
applicable caselaw indicates that Savis, as Cardenas's former employer, cannot preclude
Cardenas from utilizing expertise gained at Savis. *See Renpak*, 104 So. 2d at 645 ("Skill and
knowledge are assets gained by an employee which are transferable to his future use in
business and in life and which become a part of his own mental equipment . . . . Not all
knowledge gained by an employee or agent is confidential and in such instance equity has no
place in restriction of its subsequent use."); *see also Charles Schwab & Co. v. McMurry*, 2008
WL 5381922, at *2 (M.D. Fla. Dec. 23, 2008) (cleaned up) ("A former employer cannot,
however, preclude an employee from utilizing expertise that he gained during his former
employment."). Savis makes no attempt to show how an employee utilizing their training,
absent confidential information, would necessarily result in breach. [Dkt. Nos. 199, 219, 226.]

far as this court knows, so any acts designed to try to secure a job with Pfizer amount at most to 'mere preparation to,' compete, which would not have violate Cardenas's duty of loyalty even if he had decided to go out on his own and vie for business with Savis.").] Simply put, based on the record, Cardenas's preparation to join Pfizer did not necessarily breach his fiduciary duty.

Cardenas may have had access to Savis's confidential information [Dkt. No. 170 at 16–17; Dkt. No. 217 at ¶¶13, 10, 18–19, 35], but Savis fails to present sufficient evidence that Cardenas ever utilized that information while at Pfizer or that he otherwise solicited Pfizer to usurp a business opportunity for himself. *See Fish*, 401 So. 2d at 845 (giving examples of violative acts including "*using* confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment" (emphasis added)). Indeed, the opposite is true—Savis has always maintained that its business with Pfizer has continued, despite Cardenas' departure. [Dkt. No. 217 at ¶¶ 25, 41, 44.]

Nor does the Court find *Hennegan Company v. Ariola*, 855 F. Supp. 2d 1354 (S.D. Fla. 2012) persuasive. [Dkt. No. 226 at 3–4.] In *Hennegan*, the defendant was alleged to have breached his duty of loyalty by soliciting his subordinate and customers and by using the company's resources. 855 F. Supp. 2d at 1362. The Court found that plaintiff failed to establish a breach of fiduciary duty because he only solicited a customer of his former employer after his former employer had passed over the opportunity. *Id.* The facts of this case are far afield from *Hennegan* and Savis's citation to one line of that case does little to rectify this. [Dkt. No. 226 at 3–4.]

Finally, Savis has not provided a satisfactory explanation for its damages request, despite this Court's express request for this precise information. [Dkt. No. 224 at 2 (noting that "Savis's damage calculations for Counts III to V suffer similar deficiencies, as each rely on its discussion of Counts I and II.").] All told, the Court cannot conclude as a matter of law that Cardenas is liable for breach of fiduciary duty under Count Three. Savis's request for summary judgment on these grounds is denied.

### F. Count Four: Breach of Implied Covenant of Good Faith and Fair Dealing

Savis seeks summary judgment on Count Four, breach of implied covenant of good faith and fair dealing. [Dkt. No. 199 at 18–21.] "Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999); *see also County of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1050 (Fla. 1997) ("[E]very contract includes an implied covenant that the parties will perform in good faith."). "[G]ood faith means honesty, in fact, in the conduct of contractual relations." *Harrison Land Dev., Inc. v. R & H Holding Co., Inc.*, 518 So. 2d 353, 355 (Fla. Dist. Ct. App. 1988). A claim for breach of the implied covenant of good faith cannot be maintained in the absence of breach of an express contract provision. *Weaver*, 169 F.3d at 1316.

Savis argues that Cardenas breached this covenant when he breached his employment contract and non-compete provision by soliciting a job and subsequently accepting similar employment from Pfizer. [Dkt. No. 199 at 19–20.] Given that this claim is dependent on breach of an express contract term, this claim rises or falls with

Savis's other contract claims. *Weaver*, 169 F.3d at 1316. While the Court has expressed doubts about Savis's ability to establish a breach based on Cardenas's conversation with Hall, it has found that Cardenas breached both his renewal offer and his non-compete by taking a job with Pfizer where he provided similar or competitive services. [Dkt. No. 170 at 19.] As such, liability on a claim for breach of the implied covenant of good faith and fair dealing would necessarily follow.

But once again, Savis's purported damages from this claim are predicated on its damages calculations in Counts One and Two. The issues discussed in the Opinion preclude summary judgment on those claims, and the Court cannot determine as a matter of law what damages Savis is entitled to as a result of this breach. [Dkt. No. 224 at 2 ("While the Court appreciates that Savis lays out its requested damages in some detail in Count II, Savis provides no explanation for why it requests 'ongoing' damages or whether it seeks a separate damage award apart from Count I. Savis' damage calculations for Counts III to V suffer similar deficiencies, as each rely on its discussion of Counts I and II." (internal citation omitted)).] The Court denies Savis's summary judgment motion on its breach of implied covenant of good faith and fair dealing claim, Count Four.

### G. Count Five: Tortious Interference with a Business Relationship

Savis seeks summary judgment on Count Five for tortious interference with a business relationship, namely its business relationship with Pfizer. [Dkt. No. 199 at 21–24.] To prove a tortious interference claim, Savis must demonstrate: "(1) the existence of a business relationship that affords the plaintiff existing or prospective

legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).

Much like Savis's argument that Cardenas breached his employment contract, Savis argues that Cardenas interfered with its business relationship with Pfizer by taking a job there. According to Savis, because Cardenas quit and it took a long time to fill his role, Savis lost out on his portion of the billing proposal and lost internal goodwill amongst Savis engineers. [Dkt. No. 199 at 22–23.]

Even assuming Savis has shown the first two elements, it fails to meet its burden as to the third element: intentional and unjustified interference with that relationship. To prove this element, Savis must show that Cardenas acted with malice or ill will. *See IBP, Inc. v. Hady Enterprises, Inc.*, 267 F. Supp. 2d 1148, 1164 (N.D. Fla.), *aff'd sub nom. IBP, Inc. v. Hady Enterprises*, 52 F. App'x 487 (11th Cir. 2002) (citing *Rockledge Mall Assocs., Ltd. v. Custom Fences of S. Brevard, Inc.*, 779 So. 2d 554, 557 (Fla. Dist. Ct. App. 2001)); *see also In re Tuscany Energy, LLC*, 581 B.R. 681, 692 (Bankr. S.D. Fla. 2018) ("[A] claim for tortious interference with contract must be based on an intentional act done with the aim, at least in part, of interfering with the rights of another."). "The only way that malice can be proven in the absence of direct evidence is by proving a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a

34

reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill will, or other bad motive." *Rockledge*, 779 So. 2d at 557 (quoting *Southern Bell Tel. and Tel. Co. v. Roper*, 482 So. 2d 538, 539 (Fla. Dist. Ct. App. 1986)).

Savis does not identify any evidence pointing towards Cardenas's intent to interfere with its contract with Pfizer. [Dkt. Nos. 199, 219.] Rather, it points to general "bad facts" that it purports show that Cardenas acted in bad faith, namely that he solicited a job at Pfizer during working hours without requesting leave from Savis to do so and by "[misleading] Savis into believing that he would seek to enter graduate school at the University of Illinois." [Dkt. No. 199 at 22.]

Viewed in the light most favorable to the non-movant—Cardenas—these facts do not amount to "a plan or course of conduct motivated by spite, ill will, or other bad motive" to interfere with Savis's relationship with Pfizer. *Rockledge*, 779 So. 2d at 557. Savis has not shown that these actions were necessarily "done with the aim, at least in part, of interfering with the rights of another." *In re Tuscany Energy, LLC*, 581 B.R. at 692. On this record, a reasonable jury could conclude that Cardenas intended to interfere with Savis' business relationship with Pfizer, but it could also find that Cardenas simply intended to leave Savis' employ. Based on this record, there is enough evidence to take this claim to a jury. Summary judgment as to the intentional interference with business relationships claim is denied.

## V.  Conclusion

For the reasons outlined above, Savis's third summary judgment motion [Dkt. No. 198] is granted in part and denied in part and Cardenas' second summary judgment motion [Dkt. No. 207] is denied.

Enter: 18-cv-6521
Date:  September 13, 2023

_____
Lindsay C. Jenkins
United States District Judge